# EXHIBIT 7

STATE OF MICHIGAN

54-A JUDICIAL DISTRICT COURT (CITY OF LANSING)

PEOPLE OF THE STATE OF MICHIGAN,

v                                                File No. 15-04387

PAUL HARCZ,

                    Defendant.

_____/

15-967-FH
WeC

PRELIMINARY EXAMINATION

BEFORE THE HONORABLE LOUISE ALDERSON, DISTRICT JUDGE

Lansing, Michigan — October 16, 2015

Courtroom No. 3

APPEARANCES:

For the People:              CHARLES KOOP (P75188)
                             Assistant Prosecuting Attorney
                             303 West Kalamazoo Street, Floor 4R
                             Lansing, Michigan  48933

For the Defendant:           MARK KAMAR (P35038)
                             Attorney at Law
                             1010 North Washington
                             Lansing, Michigan  48906

RECORDED BY:                 Tami Marsh, CER 5297
                             Certified Electronic Reporter
                             (517) 483-4421

1

TABLE OF CONTENTS

WITNESSES:  PEOPLE                                          PAGE

EDWIN HENRIQUEZ
Direct Examination by Mr. Koop                                7
Cross-Examination by Mr. Kamar                              15
Redirect Examination by Mr. Koop                           26
Recross-Examination by Mr. Kamar                           27




WITNESSES:  DEFENDANT

None




EXHIBITS:                          MARKED           RECEIVED

PX#1 - CD of bodycam                 28                29

1

2

Ingham065

1    Lansing, Michigan

2    Tuesday, October 16, 2015

3    At 2:24 p.m.

4    THE COURT:  We're on the record in the matter of

5    the State of Michigan versus Paul Harcz, H-a-r-c-z, 15-

6    04387-FY.  Today is the date set for preliminary

7    examination in this matter.  I've had an opportunity to

8    meet with counsel.  I understand there are, like, nine or

9    so bodycam videos of this incident.  I have preliminarily

10   told the parties this is a probable cause hearing; not a

11   trial.  Each party is to pick out their particular video

12   they want me to see.  They only get one each.  And I left

13   it to the parties to figure out which ones they use as

14   they think best helps their case.

15          Is that an accurate statement of what took place

16   in chambers, Mr. Koop?

17          MR. KOOP:  It is, Your Honor.

18          THE COURT:  Okay.  Mr. Kamar, you're here for

19   the defendant?

20          MR. KAMAR:  Yes, Your Honor.

21          THE COURT:  Is that an accurate statement of

22   what took place?

23          MR. KAMAR:  It is, Your Honor.  And I would just

24   put for the record, and I understand the cumulative court

25   rule, but I think some of these are a little bit

3

1     different, but I certainly understand the Court's ruling,

2     and I think we're gonna, for todays' purposes, although I

3     object, we're gonna use, um, I believe video 15 and 17; is

4     that correct?

5               MR. KOOP:  Video 15, which is approximately 24

6     minutes long, Your Honor, and video 19, which is 35

7     seconds long.

8               THE COURT:  Okay.

9               MR. KAMAR:  And, also, he has agreed to

10    sequester the witnesses, and I have done the same.  I've

11    gotten his possible witnesses down the road.

12              THE COURT:  I see a sergeant from the State

13    Police here.  I assume he's your witness?

14              MR. KOOP:  He will be my witness, Your Honor.

15              THE COURT:  Who are the people in the back of

16    the courtroom?

17              MR. EAGAN:  Paul Eagan, Your Honor, from the

18    Detroit Free Press.

19              THE COURT:  Did you submit a document to me, a

20    media request?

21              MR. EAGAN:  I thought it was a public courtroom,

22    sir?

23              THE COURT:  It is a public courtroom, sir.

24    You're not taking any pictures or anything, are you?

25              MR. EAGAN:  No.

4

1        THE COURT:  Okay, you know the drill.  You know

2   people come in and they submit a media request.  Okay.

3   I'm not trying to keep anybody out.  If you're not taking

4   pictures, that's fine.

5        MR. EAGAN:  Thanks.

6        MS. SULLIVAN:  I'm Terry Sullivan.  I

7   transported him down here from Mt. Morris.

8        THE COURT:  Okay.  And did you transport him on

9   the day in question?

10        MS. SULLIVAN:  I transported him, yes, I did,

11   and dropped him off.  I was not here at the time of the

12   incident.  I dropped him off to the group that he was down

13   here with for the event.

14        THE COURT:  Okay.  All witnesses or potential

15   witnesses are ordered sequestered.

16        MS. SULLIVAN:  I wasn't there--

17        THE COURT:  Ma'am, ma'am.  I'm sorry, you can

18   have a seat.

19        MS. SULLIVAN:  Thank you.

20        THE COURT:  Okay.  Pursuant to the request of

21   Defense, all witnesses or potential witnesses are ordered

22   sequestered.  What about the lady back there?

23        MR. KAMAR:  We do not intend on calling her.

24   There's a number of witnesses that we intend on calling,

25   and she's not one of them.

Ingham068

1    THE COURT:  Mr. Koop.

2    MR. KOOP:  I'd ask for a mutual sequestration.

3  I'm not going to call her, and if Mr. Kamar isn't going to

4  be calling her, I have no problem with her staying in

5  here.

6    THE COURT:  She may remain in the courtroom.

7  Just make sure we have her name preserved so at some point

8  if she becomes a witness, if this case survives today, the

9  People would know that she was present in the courtroom

10  and is certainly free to take whatever they choose to do

11  down the road.  Anything else?

12    MR. KOOP:  Not from the People, Your Honor.

13  Thank you.

14    THE COURT:  Call your first witness.

15    MR. KOOP:  People call Sergeant Edwin Henriquez.

16    THE COURT:  Raise your right hand, please.  Do

17  you solemnly swear or affirm the testimony you're about to

18  give in this cause will be the truth, the whole truth, so

19  help you God?

20    MR. HENRIQUEZ:  I do.

21    THE COURT:  Thank you.  Please be seated for a

22  minute.  Once you get him settled, I need that court file.

23  We need to put a waiver on from this morning.  We're going

24  to call his lawyer up on the phone.  Apparently, I looked

25  at the date for the conference and not the arraignment, so

6

1    my point of reference in that was wrong, so we do need a

2    written waiver.

3              MR. KOOP:  That's fine.

4              THE COURT:  Or an oral waiver of the 21 day for

5    that, so we're gonna get his lawyer on the phone as soon

6    as I get the file in here.  So at some point we're going

7    to interrupt and take care of that, okay.  For now we'll

8    let him sit here and get some fresh air.

9              MR. KOOP:  That works.

10             THE COURT:  Sir, state your name for the record,

11   please, and spell your last name.

12             THE WITNESS:  I'm Sergeant Edwin Henriquez.

13   It's spelled H-e-n-r-i-q-u-e-z.

14             THE COURT:  Thank you.  Mr. Koop.

15             MR. KOOP:   Thank you, Your Honor.

16                  EDWIN HENRIQUEZ,

17   At 2:28 p.m., called by Mr. Koop and sworn by the Court;

18   testified as follows:

19                  DIRECT EXAMINATION

20   BY MR. KOOP:

21   Q    Good afternoon, sir.

22   A    Good afternoon, sir.

23   Q    Where are you currently employed?

24   A    Michigan State Police, Capitol Security.

25   Q    In what capacity are you so employed with the State

7

```
 1        Police?
 2   A    I'm a sergeant there, sir.
 3   Q    How long have you been a sergeant with the Capitol
 4        security?
 5   A    Since January of 2015.
 6              THE COURT:  How long have you been with the
 7        State Police?
 8              THE WITNESS:  Ten years, sir.
 9              THE COURT:  Thank you.
10   BY MR. KOOP:
11   Q    Sergeant, were you duty on or about September 17 of 2015?
12   A    Yes.
13   Q    And what role were you fulfilling that day?
14   A    I was asked to come in to help supervise the event going
15        on that day.
16   Q    And what event was going on that day?
17   A    Twenty-fifth Anniversary of the American with Disability
18        Act.
19   Q    To your knowledge is that a reserved event?
20   A    To my knowledge, yes.
21   Q    And at some point on September 17th, 2015, did you confront
22        a group of individuals on the Capitol lawn?
23   A    Yes.
24   Q    And where did that take place?
25   A    Around the Austin Blair statute, which is just off of
```

8

1       Capitol Avenue.  It's on the state property.

2  Q    That's the statue right in front, correct.

3  A    And tell the Court what occurred at that, I guess for lack

4       of a better word, meeting?

5  Q    What occurred at that meeting is we had information--State

6       Police had information that a counter-protest was coming

7       to that event to protest the ADA.  This group was

8       identified as that counter-protestors. -I approached them

9       and I told them that while they are more than welcome to

10      be on state property, they can't actually disrupt the

11      event.  So we asked them if they were going to protest

12      that can't pass this statute right here.

13              THE COURT:  That they couldn't go past the

14      statute?

15              THE WITNESS:  That's correct.

16  BY MR. KOOP:

17  Q    And was there anything done to prevent this group from

18       going past the statute?

19  A    Yes, initially we had about five or six officers just line

20       up in front of them to prevent them.  As time went on the

21       group got a little more agitated, so we thought it would

22       be safer to get out metal barricades.   So we placed metal

23       barricades in front for everyone's safety.

24  Q    Between the officers and this group?

25  A    That's correct.

```
 1   Q    All right.  And at some point did you identify an

 2        individual later named Paul Harcz, Jr.?

 3   A    Yes, I did.

 4   Q    And if you saw Mr. Harcz--am I saying that correctly, Mr.

 5        Kamar?  Harcz.

 6             MR. KAMAR:  That's correct.

 7   BY MR. KOOP:

 8   Q    If you saw Mr. Harcz again, would you be able to identify

 9        him?

10   A    Yes.

11   Q    And do you see him in the courtroom today?

12   A    I do.  I see him right here.

13   Q    And you've identified--can you point to something he's

14        wearing?

15   A    Yes, a blue sweater.

16             MR. KOOP:  Your Honor, I'd ask that he's

17        identified the defendant.

18             MR. KAMAR:  No objection, Your Honor.

19             THE COURT:  Without objection for purposes of

20        preliminary examination, the record should reflect the

21        witness has identified the defendant who is seated at the

22        counsel table with a blue, he said sweater, it's actually

23        a blue vest, with a light blue button-down shirt under it.

24   BY MR. KOOP:

25   Q    Now, Sergeant, at any point in first coming into contact
```

10

1   with the defendant to his ultimate arrest--prior to his

2   ultimate arrest, did anyone either yourself or another

3   member of the Capitol security, State Police identify

4   yourselves as the police?

5 A  Yes.

6 Q  Was that orally?

7 A  Orally, yes.

8 Q  And prior to putting up the metal barricade had the

9   defendant tried to break through the, I guess, wall of

10   officers?

11 A  Yes.

12 Q  How did that occur?

13 A  He came with his walking stick, and he was feeling around

14   the officers, hitting them on their legs, hitting between

15   their legs, attempting to go through.  At one point I went

16   up to him and told him to stop that because he's hitting

17   my officers and he needs to calm down.  At that point he

18   did step back.

19      THE COURT:  He did what?

20      THE WITNESS:  He did step back after that.

21 BY MR. KOOP:

22 Q  And after he stepped back is there more protesting

23   occurring; is there more chanting?

24 A  Yes.

25 Q  How long does this go on for?

Ingham074

1   A   The whole thing last maybe for, just before his arrest,

2       about a half hour.

3   Q   And then you said at some point some metal barricades are

4       put up, correct?

5   A   Yes.

6   Q   And after the metal barricades are put up, is there any

7       further contact from the defendant with officers?

8   A   Yes.

9   Q   How?

10  A   At one point the defendant walked up to the barrier and

11      with his hand felt it and was heard saying he's going to

12      go through.  He doesn't care the barrier's there, he's

13      gonna go through.

14              THE COURT:  He said that?

15              THE WITNESS:  He said that, yes.

16              THE COURT:  What did he say?

17              THE WITNESS:  I can't state verbatim, but he

18      pretty much said that he's gonna go through this barrier

19      and he doesn't care if he gets arrested.

20              MS. MORRELL:  Judge, she can't hear him.

21              THE COURT:  What?

22              MS. MORRELL:  She can't hear very well.

23              THE COURT:  Can't hear who, me or him?

24              MS. MORRELL:  Him.

25              THE COURT:  You gotta keep your voice up.

12

```
 1          That's nice you want to turn and look at me, that's fine,
 2          but just talk right into the microphone.  I can hear you.
 3          Okay.
 4                    THE WITNESS:  Yes, sir.
 5                    THE COURT:  So he turned to you and said he was
 6          going--words to the effect of going through, didn't care
 7          if he got arrested?
 8                    THE WITNESS:  Yes.
 9   BY MR. KOOP:
10   Q      And did he, in fact, attempt to go through the metal
11          barricades?
12   A      Yes.
13   Q      And did he get through the metal barricades?
14   A      We prevented him from getting through it.
15   Q      You prevented him from entering?
16   A      Initially, yes.
17   Q      Okay.  The metal barricades?
18   A      Well, like I said, he felt his way with his hands along
19          the railing, and when he got to the end of it, we only had
20          about two barricades up, so when he got to the end of it,
21          he attempted to go around it.
22   Q      Okay.
23   A      And at that point Officer Brian George tried to physically
24          stop him, stood in front of him and told him not to, you
25          know, you can't go through.  And he pushed--tried to put
```

13

1   his body—tried to push his way through.  When I saw that,

2   I approached to help Officer George to prevent him from

3   going through the barricade.   And at the same time I was

4   also asking the defendant to stop it, because he's not

5   gonna get through and we will not allow him to disrupt the

6   event.  He insisted on pushing through.

7   Q   Okay.  And both officers are wearing body cameras at the

8   time, correct?

9   A   That's correct.

10   Q   And those were subsequently turned over to the

11   prosecutor's office; is that correct?

12   A   Correct.

13   Q   Okay.  And the defendant was ultimately arrested that day?

14   A   Yes.

15   Q   Okay.  Were you instructed by anyone specifically to

16   prevent this defendant or his group from attending the

17   Capitol further than the statute?

18   A   Yes, I was.

19   Q   Who was that?

20   A   My lieutenant, Lieutenant Jason Williams.

21                THE COURT:  And what was he doing?

22                THE WITNESS:  He was in command of the event.

23   BY MR. KOOP:

24   Q   Were you in uniform that day?

25   A   Yes.

Ingham077

```
1    Q    Again, you had at least yourself or other officers

2         identified yourselves as State Police?

3    A    Yes.

4    Q    Orally?

5    A    Yes.

6    Q    And this all occurred at the Michigan State Capitol, City

7         of Lansing, Ingham County, State of Michigan?

8    A    Yes.

9              MR. KOOP:  I have nothing further.

10             THE COURT:  Mr. Kamar.

11             MR. KAMAR:  Thank you, Your Honor.

12                  CROSS-EXAMINATION

13   BY MR. KAMAR:

14   Q    Now, Officer, obviously, let's go back to September 17,

15        2015.  There was an event there; is that correct?

16   A    Yes.

17   Q    And that event was for the American with Disabilities; is

18        that correct?

19   A    That's correct.

20   Q    And there was a number of blind people there; is that

21        correct?

22   A    That is correct.

23   Q    And there was a number of blind people who were allowed to

24        pass through the barrier, which was I believe the statute

25        of Austin Blair?
```

1   A   That is correct.

2   Q   Okay.  And you indicated your sergeant indicated to you to

3       stop a certain group?

4   A   That's correct.

5   Q   How could you identify that group?

6   A   Well we identified them as being protestors by the blow

7       horn and the protest signs they were carrying.

8                THE COURT:  Well, let me ask you this.  Are you

9       talking——let's get some things straight here.  So you have

10      an ADA event and you have some people who were visually

11      impaired or blind who are there supporting this

12      anniversary, correct?

13               THE WITNESS:  Correct.

14               THE COURT:  And I believe you indicated there

15      was——you had gotten word that there was going to be a

16      counter-protest?

17               THE WTINESS:  That's correct.

18               THE COURT:  So when you speak about the people

19      who are allowed to go through, how do you know they were

20      not counter-protestors?

21               THE WITNESS:  These individuals came off a bus

22      that was parked across the street.  It was a big marked

23      bus that we saw and they came off the bus.

24               THE COURT:  Okay.  Now, you gotta just talk into

25      the mike.  I won't take it as rude.  And keep your voice

16

1    up.

2            Now, Mr. Kamar is saying how did you identify

3    the protest group.  I assume this would be the counter-

4    protest group?

5            THE WITNESS:  That's correct.

6            THE COURT:  And it's your testimony the

7    defendant was part of the counter-protest group?

8            THE WITNESS:  That is correct.

9            THE COURT:  And how do you come about that

10   decision--or how did you draw that conclusion?

11           THE WITNESS:  He came off the bus that was

12   identified to be carrying the protestors, and when they

13   crossed the street they were carrying protest signs and a

14   bull horn.

15           THE COURT:  Well, how did you know this bus was

16   for counter-protestors?

17           THE WITNESS:  We had information from Sergeant

18   Held and Lieutenant Jason Williams.  They had information

19   from the intelligence division of State Police that a bus,

20   that markings that were on the bus that day would be

21   carrying this group of protestors.  So we were expecting

22   them to show up.

23           THE COURT:  Go ahead, Mr. Kamar.

24   BY MR. KAMAR:

25   Q   Isn't it true you never saw anybody get off that

17

| | | |
|---|---|---|
| 1 | | particular bus? |
| 2 | A | I never saw anyone?  No, that's not true I didn't see |
| 3 | | anyone get off that bus. |
| 4 | Q | Okay.  Isn't it true you never saw Mr. Harcz come off that |
| 5 | | bus? |
| 6 | A | I did see him come off that bus. |
| 7 | Q | All right.  Where was the bus located? |
| 8 | A | The bus was located on Capitol Avenue. |
| 9 | Q | Capitol facing south? |
| 10 | A | That's correct. |
| 11 | Q | And where were you, sir? |
| 12 | A | I was on Capitol Avenue facing east. |
| 13 | Q | All right.  And they would have, obviously, the bus door |
| 14 | | would have opened facing east; is that correct? |
| 15 | A | That's correct. |
| 16 | Q | Okay.  Where were you at that location at that time? |
| 17 | A | I was on Capitol Avenue facing east. |
| 18 | Q | All right.  And how many people did you see come off the |
| 19 | | bus? |
| 20 | A | Maybe ten. |
| 21 | Q | All right.  And what signaled there was something up with |
| 22 | | these folks was because they had signs and bull horns? |
| 23 | A | And because of the bus that was marked Freedom Bus, or |
| 24 | | something to that effect, and that's the bus that said |
| 25 | | they were going to show up in. |

18

```
 1                      THE DEFENDANT:  (Inaudible)

 2                      MR. KAMAR:  Okay.  Please don't say anything.

 3                      THE COURT:  Mr. Kamar.

 4                      THE DEFENDANT:  I'm sorry.  I was coughing.

 5                      THE COURT:  No, sir, you weren't.  You were

 6            doing a little more than coughing.  Okay.

 7                      THE DEFENDANT:  Okay.

 8                      THE COURT:  Knock it off.  Thank you.

 9                      THE DEFENDANT:  All right.  Sorry.

10                      MR. KAMAR:  You know all you're doing is ruining

11            my train of thought.  Okay.

12                      THE DEFENDANT:  Sorry.

13                      MR. KAMAR:  All right.

14     BY MR. KAMAR:

15     Q    All right.  So a bus by the name of Freedom Bus goes to

16          the State Capitol to protest; is that correct?

17     A    That's correct.

18     Q    And you never had any information, isn't it true, sir,

19          that these people had any weapons or anything of that

20          nature, correct?

21     A    No, no weapons that we knew of.

22     Q    No weapons, no explosives; is that correct?

23     A    Not to my knowledge.

24     Q    And so is it your opinion that it's illegal for people to

25          protest or anti-protest at the Capitol?
```

19

1   A   Absolutely not.

2   Q   All right.  And this is a protest for—this is a

3       celebration for the American with Disabilities Act; is

4       that correct?

5   A   That is correct.

6   Q   All right.  And so we have Mr. Harcz, who is, as far as

7       you know, is completely blind; is that correct?

8   A   As far as I know, yes.

9   Q   All right.  And so he is disabled, correct?

10  A   Correct.

11  Q   And did you have any clue that he was invited to this

12      thing?

13  A   I do not have any clue about that, no.

14  Q   All right.  And isn't it true you never asked him?

15  A   No, I did not ask him.

16  Q   All right.  And, then, isn't it true that he was one of

17      the individuals that helped organize the event?

18  A   I'm not aware of that.

19  Q   And you didn't ask him that?

20  A   No.

21              THE COURT:  Mr. Kamar, which event?  The

22      celebration or the counter-protest?

23              MR. KAMAR:  The celebration itself.

24              THE COURT:  All right.

25  BY MR. KAMAR:

Ingham083

1   Q   Now, when I saw the video, it appears, and I think the

2       Judge is going to be seeing this one, and Mr. Koop will

3       correct me if I'm wrong, when I saw the video it indicates

4       that a sighted person was handed a brochure from your

5       sergeant; do you recall that?

6   A   I do.

7   Q   Did you hand that brochure or did somebody else?

8   A   Somebody else did.

9   Q   All right.  And that person is sighted; is that correct?

10  A   Yes.

11  Q   And isn't it true that brochure was not in braille?

12  A   That's correct.

13  Q   So you guys gave the rules and regulations to individuals

14      where they could go and where they couldn't go in print,

15      correct?

16  A   Correct.

17  Q   And not in braille, correct?

18  A   Correct.

19  Q   All right.  And so he goes there, my client, Mr. Harcz

20      goes there, and there is no barricades, correct?

21  A   Correct.

22  Q   All right.  And he has, as far as you know, he has no clue

23      where the Austin Blair statute is, correct?

24  A   Correct.

25  Q   He can't see it, correct?

21

1   A    Correct.

2   Q    And isn't it also true he had no clue the barricades were

3        being put up?

4             MR. KOOP:  Objection, speculation.

5             THE COURT:  I'm going to sustain the objection.

6             MR. KAMAR:  I'll rephrase it.

7             THE COURT:  Thank you.  When you say he had no

8        clue, I mean he has other senses.

9             MR. KAMAR:  Okay.  I understand.

10  BY MR. KAMAR:

11  Q    Where was he, if you know, when the barricades were put

12       up?

13  A    He was standing right in front of us.

14  Q    All right.  Did you tell him we're putting barricades up?

15  A    No.

16  Q    Okay.  And how close was he to the barricades?

17  A    Less than three or four feet.

18  Q    All right.  And how are they placed out?  Are they carried

19       out?

20  A    Yes.

21  Q    Who carried them out?

22  A    We had people who work at the Capitol carry them out.

23  Q    So machines don't come and lay them down?

24  A    No.

25  Q    All right.  And then he goes forward with his cane, right?

Ingham085

```
 1   A   Not immediately, but yes, he does eventually.

 2   Q   All right.  He goes forward and then you say he felt the

 3       barriers?

 4   A   Yes.

 5   Q   Okay.  And describe the barriers to the Court?

 6   A   Thin metal barriers, about three feet high, maybe.  Four

 7       feet at the most.

 8   Q   Okay.  And you observed him feel the top of the barriers?

 9   A   I did.

10   Q   Okay.  And did he try--did he feel his way around the

11       barriers?

12   A   Yes, he did.

13   Q   And let's go back, and I think I skipped this--strike

14       that.  I didn't skip that.  Did you feel it was illegal

15       for certain people to protest this event?

16           MR. KOOP:  I'm gonna object to that; calls for a

17       legal conclusion, Your Honor.

18           MR. KAMAR:  Well, I think he's being arrested or

19       stopped for protesting, and I think that's very

20       unconstitutional.

21           MR. KOOP:  That's not the charge.  He's charged

22       with resisting and obstructing, Your Honor.  He's not

23       charged with illegally protesting.

24           THE COURT:  What's the question?

25   BY MR. KAMAR:
```

23

1   Q   Do you think it's improper for somebody to go on the

2        Capitol and protest if they don't like something?

3   A   No.  It happens all the time.

4   Q   Happens all the time?

5   A   Uh-huh.

6             THE COURT:  That's all right.

7             MR. KAMAR:  Let me see if I have anything else,

8        because I think the videos speak for themselves.  I don't

9        believe I have anything else, Judge.

10            THE COURT:  All right.  Any redirect, Mr. Koop?

11            MR. KOOP:  No, Your Honor.

12            THE COURT:  All right.  Thank you.

13            MR. KOOP:  But we will have the video.

14            THE COURT:  Right.  Officer, you may step down,

15        but I'm going to ask that you stay in the courtroom in

16        case we need you for the video.  Actually, sir, have a

17        seat.  I have a couple questions for you.

18            THE WITNESS:  Yes, sir.

19            THE COURT:  These metal barriers or barricades

20        that you put up.

21            THE WITNESS: Yes.

22            THE COURT:  Do they just cover the sidewalk in

23        front of the Blair statute or do they extend the entire

24        front of the State Capitol?

25            THE WITNESS:  Just on the sidewalk.

1        THE COURT:  The bus with the counter-protestors

2    that you said the defendant got off of, it was parked on

3    Capitol Avenue?

4        THE WITNESS: Yes.

5        THE COURT:  Capitol Avenue runs from Ottawa

6    Street to Allegan.  It's about two or three blocks along

7    Capitol Avenue.  The bus that the counter-protestors got

8    off, that you say include the defendant, where on Capitol

9    was that?

10        THE WITNESS:  Just off Michigan.

11        THE COURT:  So the bus is actually parked on

12    Michigan?

13        THE WITNESS:  No.  It's parked on Capitol just

14    before the intersection of Michigan Avenue.

15        THE COURT:  Okay, so it would have been--

16        THE WITNESS:  Just in front of the courthouse,

17    actually.

18        THE COURT:  So it would have been north of--it

19    was parked pretty much right there out in front of City

20    Hall?

21        THE WITNESS: That's correct?

22        THE COURT:  Towards the corner?

23        THE WITNESS:  Yes.

24        THE COURT:  What about the bus with the

25    celebrants or the people who were there to celebrate the

Ingham088

1  anniversary of the ADA; where was that bus parked on

2  Michigan?

3          THE WITNESS:  There were not a lot of buses, but

4  the participants, they came on their own, most of them.

5  There was one bus parked, I think, on Ottawa.  It was for

6  the equipment, everything brought up.

7          THE COURT:  The bus that the defendant got off

8  of, did it have a sign or something identifying--how did

9  you know that was the bus or was going to be the bus with

10  the counter-protestors on it?

11          THE WITNESS:  I was informed by my lieutenant.

12          THE COURT:  Yeah, but you know, it didn't have a

13  sign on it, did it?

14          THE WITNESS:  It actually did.  It had graphics

15  on the whole bus.

16          THE COURT:  And what did it say?

17          THE WITNESS:  Something Freedom Bus or Freedom

18  Riders, something to that effect.  I couldn't tell you

19  exactly what it said.

20          THE COURT:  All right.  Any other questions of

21  the witness, Mr. Koop, as it relates solely to my

22  questions.

23                    REDIRECT EXAMINATION

24  BY MR. KOOP:

25  Q  Besides there just being a bus arriving, was there further

26

1          intelligence about this group?

2     A    Yes.

3     Q    That they would be coming to this event?

4     A    Yes.

5     Q    Was there intelligence that the event organizers did not

6          want this group to disrupt the event?

7     A    Yes.

8     Q    So it wasn't just a bus you were looking for; is that

9          fair?

10    A    Yes.

11              MR. KOOP:  Nothing further, Your Honor.  Thank

12         you.

13              MR. KAMAR:  Just one question based upon your

14         question.

15              THE COURT:  Go ahead, Mr. Kamar.

16              MR. KAMAR:  Thank you.

17                    RECROSS-EXAMINATION

18    BY MR. KAMAR:

19    Q    Isn't it true that there really was no counter-protestors

20         at this event?

21    A    No counter-protestors?

22    Q    Yes.

23    A    The defendant's group was protesting, yes, there was.

24    Q    Because you wouldn't let them in, correct?

25    A    They were still protesting.  They were close enough to the

27

```
 1        event to be able to be heard.

 2   Q    They said let us in, correct?

 3   A    That's what they said, yes.

 4   Q    That's the only protest that you heard, correct?

 5   A    They were protesting, yes.

 6   Q    Yeah, because you wouldn't let them in; is that correct?

 7   A    I don't what they were protesting for, sir.

 8             MR. KAMAR:  Nothing further, Your Honor.

 9             THE COURT:  All right.  You may step down.

10        We're gonna take a moment here and get Mr. Silverthorn.

11             (At 2:51 p.m., off the record)

12             (People's Exhibit Number 1 marked for

13             identification)

14             (At 2:58 p.m., back on the record)

15             THE COURT:  All right, we're back on the record

16        in the matter of the State of Michigan versus Paul Harcz.

17        Mr. Koop, do you have another witness or are we going to

18        look at the video?

19             MR. KOOP:  No other witnesses, and we would move

20        for People's Exhibit 1, which is 15 and 19 contained on a

21        disc.

22             THE COURT:  Is this TV on?

23             MR. KAMAR:  And there's a stipulation, Your

24        Honor.

25             THE COURT:  Is this off?  Is this the long or
```

28

1    the short one?

2           MR. KOOP:  This is the long one.

3           THE COURT:  All right, a 24 minute video.  By

4    stipulation, it's admitted.

5           Okay.  We'll stay on the record because I might

6    have a question, but I'm gonna come down so I can see it

7    better.

8           (At 3:01 p.m., video begins)

9           (At 3:01 p.m., video stops)

10         THE COURT:  I guess it's good we stayed on.

11    Just for identification purposes so I'm clear, there's an

12    officer in what appears to be a State Police uniform, with

13    a shadow it looks like he may have sergeant stripes, but

14    he's got on a fluorescent colored vest.  Would this be

15    Sergeant Rodriguez?

16         MR. KOOP:  Henriquez?

17         THE COURT:  Henriquez, I'm sorry.

18         MR. KOOP:  Yes.

19         THE COURT:  Okay.  We have a female here with

20    glasses who's cut off, I can't see her, and we have a

21    gentleman that—

22         MR. KAMAR:  That's Mr. Harcz.

23         THE COURT:  Excuse me.  In a ball cap with a

24    beard and has what appears to be a walking stick of some

25    type with him; would that be the defendant?

29

1    MR. KAMAR:  Yes, sir.

2    THE COURT:  All right.  Just so I know who I'm

3 looking at.  All right.

4    (At 3:02 p.m., video begins)

5    (At 3:03 p.m., video stops)

6    THE COURT:  Now, the second officer who appears

7 to be a larger framed white male, it was a sergeant with

8 glasses, who is this person here?

9    THE WITNESS:  Sergeant Jeff Held.

10    THE COURT:  Sergeant—

11    THE WITNESS:  Held.

12    MR. KOOP:  H-e-l-d.

13    THE COURT:  Held.  H-e-l-d.  Thank you.  He is

14 talking to the female that the defendant is with.  The

15 defendant would appear to be on her right.  Go ahead.

16    MR. KOOP:  I think, for clarification, the

17 gentleman in the back was a potential witness that was

18 sequestered prior to the proceeding.

19    MR. KAMAR:  That's the correct.  The gentleman

20 had been sitting in here all day.

21    THE COURT:  And so we're clear, when I asked

22 about the other sergeant who was there, there's no fence

23 up at this time or barricade; the parties have walked up

24 as Sergeant Henriquez has testified, and we are at mark

25 10:59:54 a.m.  Go ahead.

Ingham093

```
1                    (At 3:04 p.m., video resumes)

2                    (At 3:05 p.m., video stops)

3            THE COURT:  We're at 11:00:58.  A few seconds

4       before that defendant is seen chanting and raising his

5       right fist.  I can't make out what he's saying.

6            MR. KOOP:  No braille, go to jail, you can't

7       stop us.

8            THE COURT:  Do you agree, Mr. Kamar?

9            MR. KAMAR:  It says that during the course of

10      these.  I wouldn't disagree with that opinion.

11           THE COURT:  Okay.  Thank you.  Go ahead.

12                   (At 3:05 p.m., video resumes)

13           MR. KOOP:  Do you want me to pause it, Judge?

14           THE COURT:  No, I was telling you not to turn it

15      up much louder.

16           MR. KOOP:  Gotcha.

17           THE COURT:  Back that up about 30 seconds,

18      please.

19                   (At 3:20 p.m., rewinds video; resumes video)

20                   (At 3:30 p.m., video stops)

21           MR. KOOP:  At this point he's already been

22      arrested.  I'd like to play video 19, which is the 24

23      second clip.

24           THE COURT:  This was which video?

25           MR. KOOP:  This is video 15, body camera 15.
```

31

1        THE COURT:  Body camera 15 that we watched for

2   approximately 24 minutes.  All right.  Now, we're going to

3   get to body camera 16?

4        MR. KOOP:  Nineteen, Your Honor.

5        THE COURT:  Nineteen.  All right.

6        (At 3:31 p.m., video begins)

7        (At 3:32 p.m., video stops)

8        THE COURT:  All right.  Sergeant, can you take

9   the stand, please.  You may be seated.  You remain under

10  oath.  In the last video, I believe video 19.

11       THE WITNESS:  Yes.

12       THE COURT:  As it would appear, all I saw were

13  shadows, but it would appear the defendant was being led

14  away by two officers?

15       THE WITNESS:  That's correct.

16       THE COURT:  What I observed, and there was some

17  fencing, not just barricades, but it looks like six-foot

18  fencing or eight-foot fencing was placed around the

19  Capitol?

20       THE WITNESS:  That's right, sir, that's because-

21  -I'm sorry.

22       THE COURT:  Go ahead.

23       THE WITNESS:  That's because the Capitol is

24  under construction now, so that was construction fence.

25       THE COURT:  So the organizers of the event, were

32

Ingham095

1    they inside of this construction fencing up by the steps

2    or were they outside of it?

3            THE WITNESS:  They were on the outside, sir.

4            THE COURT:  Okay.  So they would have basically,

5    if I'm speaking there, my back would have been to the

6    construction fencing?

7            THE WITNESS:  That's correct.

8            THE COURT:  And then were there people there,

9    I'm gonna say for lack of a better term, supporting this,

10    they would have been facing this fencing?

11           THE COURT:  That is correct.

12           THE COURT:  So the barricade, then, that was

13    constructed along the sidewalk would have been to separate

14    the defendant's group at the Blair statute from the group

15    that was up by the fencing?

16           THE WITNESS:  That is correct.

17           THE COURT:  So that would have been the distance

18    of approximately how many feet from the Blair statute to

19    where the barricades you put up to the construction

20    fencing?

21           THE WITNESS:  I think that the report actually

22    says how many feet.  Do you want me--

23           THE COURT:  I'm sorry?

24           THE WITNESS:  I think the report says--because

25    we measured it, and the report says, I think it was 30 or

1    40 feet away, maybe.

2              THE COURT:  All right.  Mr. Koop, any further

3    questions now that we reviewed the video?  And I'll give

4    you an opportunity also, Mr. Kamar.

5              MR. KOOP:  Your Honor, was your question where

6    were the protestors stopped from entering from where the

7    event speakers were in distance?

8              THE COURT:  No.  I just wanted to know from the

9    barricade to the construction fencing.

10             MR. KOOP:  Okay.  Not from the barrier to the

11   protestors?

12             THE COURT:  Now, I thought I understood what I

13   asked.  Now, you've managed to confuse me.

14             MR. KOOP:  Fair enough.

15             THE COURT:  All right.  As I come down the steps

16   of the Capitol, there's construction fencing?

17             THE WITNESS:  Yes, sir.

18             THE COURT:  On the outside of it to where the

19   protestors were, what kind of distance are we talking?

20             THE WITNESS:  About 30 or 40 feet.

21             THE COURT:  Okay.  I thought I had it right.  Go

22   ahead, Mr. Koop.

23             MR. KOOP:  I think I'm correct now, Your Honor.

24   I was wrong.  I think I understand Your Honor now.

25             THE COURT:  Yeah, repeat that one more time.

1              MR. KOOP:  I got it.  I think it's clear on the

2       record.

3              THE COURT:  Wrong was the word you used.  Thank

4       you.

5              MR. KOOP:  Nothing further, Your Honor.  Thank

6       you.

7              THE COURT:  Anything, Mr. Kamar?

8              MR. KAMAR:  No, sir.

9              THE COURT:  All right.  Thank you.  Sir, you may

10      step down.

11             (At 3:36 p.m., witness excused)

12             THE COURT:  Any other witnesses, Mr. Koop?

13             MR. KOOP:  Not for the People, Your Honor.

14             THE COURT:  Mr. Kamar?

15             MR. KAMAR:  No proofs at this time.

16             THE COURT:  Mr. Koop.

17             MR. KOOP:  Thank you, Judge.  Your Honor, the

18      People would ask Your Honor to bind the defendant over as

19      charged.  We've heard testimony that the defendant did

20      assault, batter, wound, restrict, obstruct or oppose

21      officers at the State Capitol, including Sergeant Edwin

22      Henriquez.  That they were officers of the Michigan State

23      Police, Capitol security, and the defendant knew or had

24      reason to know they were performing their duties.

25             Now, it is a unique case, but based on the

1    initial interaction with police, when the police identify

2    themselves, first the defendant confronts the police when

3    there is not a metal barrier.  So at this point he knows

4    or has been informed that there is--

5                   THE COURT:  I saw the video, Mr. Koop.

6                   MR. KOOP:  Fair enough.  I think most

7    importantly or most telling is that the--after the metal

8    barrier is in place his counterpart identifies that

9    there's a bunch of barricades they put up.  Defendant

10   says, "You can't stop me."  He begins to advance forward.

11   And even at one point says, "I can do what I want to do.

12   I can do what I want to do."  And that's when officer--at

13   some point in there Officer Henriquez puts his hands on

14   the defendant and says you cannot be disruptive and he's

15   taken into custody.  In fact, after he--as stated in video

16   19, defendant states himself, "I'm trying to get around

17   your phony barricade.  F-you."

18                   I think the evidence supports at a prelim

19   standard probable cause that this defendant did commit

20   this crime and it occurred on or about September 17, 2015,

21   at the Michigan State Capitol, City of Lansing, Ingham

22   County, State of Michigan.  Thank you.

23                   THE COURT:  Mr. Kamar.

24                   MR. KAMAR:  Your Honor, I look at the statute

25   and the felony complaint.  I never saw an assault.  I

Ingham099

1    think the officer testified he may have while tapping his

2    cane hit somebody on the foot.  To me that's not

3    intentional assault.  That's an accidental touching.  I

4    never saw one batter.  I never saw one wound.  I didn't

5    see any resistance.  He walked up, are you the officers,

6    you the off--he never got a response.  I never saw any

7    obstruction, opposition, or especially endangering of any

8    of these officers.  And I think the only one, obviously,

9    well, I won't go there because we stipulated to the

10   report.  This is no felony, as far as I'm concerned, Your

11   Honor, and I don't think it should be bound over as the

12   same.  You know, maybe keep it as a misdemeanor.  I could

13   see maybe some sort of disorderly or something like that,

14   but to have this as a felony for what this gentleman did,

15   I mean, he's with the ADA, he's invited there, he goes

16   there, they're not let in.  At the State Capitol we don't

17   let citizens in?  And he gets upset.  Now, yelling is not

18   resisting and obstructing, so I don't think the evidence

19   is there.  Thank you.

20           THE COURT:  Thank you.  Anything else, Mr. Koop?

21           MR. KOOP:  No, Your Honor.  Thank you.

22           THE COURT:  All right.  The Court's listened to

23   the testimony of Sergeant Edwin Henriquez.  I viewed the

24   video.  The testimony is pretty simply here.  There was

25   some type of celebration at the State Capitol, the 25th

1    Anniversary of the Americans with Disabilities Act.  It

2    would appear these people obtained proper permits to have

3    that celebration there at the Capitol.  Everybody knows

4    you gotta have a permit, so there's nothing here saying

5    they didn't have a permit.  The officers were there to

6    keep the peace.  Officer Henriquez testified that they

7    received information that a counter-protest group was

8    coming, and they stepped off of a bus that was identified

9    or at least told to them to be the counter-protestors.

10    Now, they came to the Capitol, they came, which certainly

11    is their right to do.  They certainly have a right to

12    counter-protest if they choose.  The Court notes they were

13    not kept off the Capitol ground.  The Court notes

14    apparently what was going on here is the officers were

15    trying to maintain a buffer between one group and what

16    they perceived to be an opposing group.  That's no

17    different than when the Ku Klux Klan comes to the State

18    Capitol, which they have obtained permits to do.  Fencing

19    is put up.  You don't let a group of African Americans

20    come in there and intermingle with them.  That's going to

21    be danger, and everybody knows that.  These folks also

22    have a right, if, in fact, they were a counter-protest

23    group, and I'll be honest, initially it was kinda hard to

24    tell.  I couldn't tell if they were a counter-protest

25    group, but it became apparent that that's just what they

Ingham101

1    were as this event went on, as the video played.  They

2    want to get past the police officer.  There was a female

3    in the group who was trying to get information from

4    Officer Henriquez about what was going on, why they

5    couldn't get in, trying to obtain this information.  This

6    defendant was seen vehemently asserting his rights.

7    Yelling about not violating them, but it was not because

8    he was denied access to the Capitol grounds.  It was

9    because he could not get into an area on the grounds where

10   he wanted to be for his counter-protest.  That's pretty

11   simple to me.  That's what this kinda boils down to.  So

12   we're clear, nobody told them to leave the Capitol

13   grounds.  Nobody told them they couldn't be on the Capitol

14   grounds.  Okay.  They were simply attempting to keep with

15   the group they thought were to be counter-protestors,

16   which it turned out to be.  And I would indicate, I mean,

17   you know, you can vociferously state your point even to

18   the extent this defendant was seen and heard using the F-

19   word several times, including screw you, as well.  It

20   became apparent that they were counter-protestors because

21   even during the singing of the National Anthem, they were

22   disruptive, they were yelling, they were chanting.  I was

23   straining at times, such that, it was probably from where

24   the officers were that at times I couldn't hear the

25   National Anthem, but I was able to pick up words for it,

1   so I know that's what was being said, because the one

2   female said, "their damn flag ceremony," as I recall the

3   words she said.  So it became apparent, and the Court's

4   convinced for purposes of this examination that this group

5   was a counter-protest group, but, again, that's not to be

6   held against them, because they have every right to be on

7   the Capitol and to make their views known.  If they want

8   to support ADA, they can do it.  If they have an issue

9   with the ADA Act and want to be heard, they have the right

10  to do that.  However, what they do not have the right to

11  do is to disobey what would appear to be lawful commands

12  of a police officer.  No more than people protesting in

13  Baltimore about somebody that got shot.  They had no right

14  to burn up a Walgreens.  They have no right to engage in

15  the conduct they did in Baltimore, and I don't believe

16  they have the right here to disrupt and disobey, and

17  excuse my language, but apparently hell bent on disobeying

18  the lawful commands of these officers, which was

19  basically, again, stay in this area.  They were having no

20  problem having their voices heard, but simply to be in

21  this particular location when you're doing it.  And this

22  is apparently what they were taking umbrage to.

23          The statute under which he is charged, MCL

24  750.81d(1), the defendant is charged with the crime of

25  assaulting, battering, wounding, resisting, obstructing,

40

1    opposing, endangering, in this case, a State Police
2    officer who was performing his duties.  Let's stop there.
3    There's no question Sergeant Henriquez and his––Brian
4    George and the other officer were performing their duties
5    at the Capitol on the date in question, September 17th,
6    2015.  That's what they were doing.  There's no assertion
7    here that the defendant did not know they were police
8    officers because he, in effect, asked and was told they
9    were, in fact, police officers.  So he knew that.  There's
10   no question about that.  He knew they were police
11   officers.  He was––can be seen in the video listening to
12   parts of the conversation going on between the female and
13   I believe Sergeant Henriquez.  I keep saying Henrique
14   (phonetic), Henriquez, which one is it?
15            MR. HENRIQUEZ:  The Z is not silent, sir.
16            THE COURT:  Okay, very good.  With Sergeant
17   Henriquez.  Close?
18            MR. HENRIQUEZ:  Yes, sir.
19            THE COURT:  I gotta work on my Spanish.  Okay.
20   So they knew.  So that satisfies that portion of it.
21   Obstruct includes the use of––the use or threatened use of
22   physical interference or force or a knowing failure to
23   comply with a lawful command.  And that's what we have
24   here.  He obstructed the officers by failure to comply
25   with a lawful command.  It's right out of the jury

1    instructions for this particular charge here.  They were

2    asked to stay in a particular area.  The officers

3    apparently thought that they were going to be, perhaps,

4    disruptive and they decided to erect a barrier, a metal

5    barricade.  You could hear it as he was tapping on it,

6    that it was a metal barricade, because the officer

7    testified across the sidewalk.  Again, they're not trying

8    to keep him off the Capitol.  Nowhere in the video were

9    they told you can't be on the Capitol grounds.  They chose

10   to be in an area that they were being kept from to

11   maintain peace and order.  I find that's what the officers

12   were doing.  That's what's in their duty.

13        Second, the defendant knew or had reason to know

14   that the person in this case, Sergeant Henriquez, Officer

15   George, and Officer Davis were police officers.  He knew

16   that.  He asked and was told that.  He had no reason to

17   believe they weren't.

18        Now, while there was no bodily injury, he did

19   disregard—it's a lawful command I find at this stage of

20   the proceedings.

21        This is a preliminary examination.  The primary

22   function of a preliminary examination is to determine if a

23   crime has been committed and whether or not there is

24   probable cause to believe this defendant committed the

25   offense.  From *People versus Glass*, after remand, 464

42

1   Michigan 266, a 2001 case.  The Court will also cite
2   *People v. Redden*, 290 Mich App 65, a 2010 case.  The
3   prosecutor doesn't have to prove each element beyond a
4   reasonable doubt, but he has to present some evidence on
5   each element, and, again, that's by a probable cause
6   standard.  Now, one could look at this and say, well, you
7   know, they were asserting their rights, and whether or
8   not, I mean, I heard him say that they were invited.  I
9   don't know who they were invited by.  There's no evidence
10  of who they were invited by, but even if I were to assume
11  they were invited, we have here, Counsel, something that
12  is left for a jury to determine.  If they think they were
13  lawfully invited to be there to be a part of the
14  celebration, then it's a jury question.  If that's the
15  argument, there's equally enough evidence to show they
16  were there to counter-protest and the officers were
17  engaging in a safety function, to secure the grounds of
18  the Capitol and the participants involved, and certainly a
19  jury could find that.  But at this point, based on the
20  evidence I've heard, the testimony I've heard and the
21  evidence I've seen, it would appear that probable cause
22  exists to believe this defendant resisted or obstructed a
23  police officer.  He's not following their command.  And I
24  can take it a step further.  It's almost as if he wanted
25  to be in the position that he found himself in.

43

Ingham106

1          The defendant is bound over to the Ingham County

2    Circuit Court for further proceedings in this matter.   The

3    bindover date is set for October 28th at a time and

4    location to be determined by the circuit court.

5          Mr. Kamar, if your client is going to sign a

6    written waiver of that arraignment--

7          MR. KAMAR:  We already have, Your Honor.

8          THE COURT:  Very good.  We will include this in

9    the bindover, or in the file with the bindover for the

10   circuit court.

11         Mr. Harcz, basically what the waiver means, and

12   I'm sure your attorney has told you, you don't have to be

13   in court on October 28th.  This waiver that you signed will

14   take the place of your physical appearance; a not guilty

15   plea will be entered for you at that time.  For all

16   further proceedings in this matter, your attorney will be

17   notified.  I would say to you if you change any of your

18   contact information, phone or address, let Mr. Kamar know

19   so that he can reach you.  As long as he can reach you and

20   get you to Court when you need to be there, then you don't

21   have to worry about your bond being revoked.  Okay.

22         Anything further in the matter?

23         MR. KOOP:  Nothing for the People, Your Honor.

24         MR. KAMAR:  No, thank you, sir.

25         THE COURT:  All right.  Very good.  I'm going to

1    return those exhibits to the People.   That's all for the

2    record.

3              (At 3:51 p.m., off the record)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Ingham108

COUNTY OF INGHAM      )

                     )

STATE OF MICHIGAN    )


     I certify that this transcript, consisting of 46 pages, is

a complete, true, and correct record of the proceedings and

testimony taken in this case on October 16, 2015.


December 9, 2015
_____
                          Tami J. Marsh, CER 5271
                          54-A District Court
                          124 West Michigan Avenue
                          6th Floor
                          Lansing, Michigan 48933
                          (517) 483-4421