UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PAUL JOSEPH HARCZ, JR., et al.,

    Plaintiffs,

v.                                                                      Case No. 1:17-CV-112

BRODY BOUCHER, et al.,                                 HON. GORDON J. QUIST

    Defendants.
                                   /

## **OPINION**

Plaintiffs, a group of seven individuals, most of whom are disabled, wanted to attend an event celebrating the anniversary of the passage of the Americans with Disabilities Act (ADA) at the Michigan State Capitol Building in Lansing. Plaintiffs, however, were not pleased with certain aspects of the celebration—particularly that one event sponsor paid disabled employees less than the minimum wage and that the Michigan State Capitol was not ADA-compliant. Therefore, Plaintiffs sought "to protest, and to hand out leaflets communicating their opinions." (ECF No. 1 at PageID.20.) Event organizers, aware of Plaintiffs' plans and concerned that Plaintiffs would disrupt the event, notified the Michigan State Police (MSP), who agreed that no suspected protestor would be admitted. The MSP personnel delivered on their assurances and physically barred Plaintiffs from entering the event. In addition, they arrested Plaintiff Paul Harcz.

Plaintiffs have sued the event organizers, Michigan Association of Centers for Independent Living (MACIL) and Handicapper Advocacy Alliance, Inc. (HAAI), various MSP officers, and the Facilities Director for the Michigan State Capitol (State Defendants), pursuant to 42 U.S.C. § 1983. Plaintiffs allege violations of their free speech and assembly rights under the First

Amendment and their right to equal protection under the Fourteenth Amendment. In addition, Plaintiff Harcz alleges claims of false arrest and imprisonment and malicious prosecution under both the Fourth Amendment and state law.

All Defendants have moved for dismissal and/or summary judgment. MACIL has filed a motion to dismiss; the State Defendants have filed a motion to dismiss, or in the alternative, for summary judgment; and HAAI has filed a motion for summary judgment. The motions are fully briefed, and the Court heard oral argument on November 2, 2017.

The Court will grant all Defendants' motions and dismiss Plaintiffs' complaint.

## I. Background

In the autumn of 2014, interested parties began to plan an event to celebrate the 25th anniversary of the ADA, to be held the following autumn on the grounds of the Michigan State Capitol, a public forum. The event was advertised as "free and open to the public." (ECF No. 1 at PageID.7.) The Michigan State Capitol Committee issued a permit to Ellen Weaver to conduct the event on September 17, 2015, on the East Lawn, North and South side, and the East steps and walks of the Capitol Grounds. (*Id.*; ECF No. 37-6.) Plaintiff Harcz was involved in planning the event. He and other Plaintiffs had expressed concern that a private sponsor of the event paid disabled employees less than minimum wage and that the Capitol itself was not ADA-compliant. (ECF No. 1 at 8.) Plaintiffs expressed these concerns to Sara Grivetti, who represented MACIL and was the chief organizer of the event. Grivetti subsequently alerted others that there could be protests at the event. (*Id.*)

Plaintiffs allege that Ellen Weaver represented HAAI in planning the event and expressed concern to an MSP officer about protestors who might arrive on a Road to Freedom bus. Plaintiffs allege that Grivetti and Weaver each made calls to the State Defendants expressing concern about

protestors and that on the day of the event, "Grivetti and Weaver told Sgt. Held that they did not want protestors to disrupt the event." (*Id.* at PageID.10.) Sgt. Held assured them that the MSP would exclude any suspected protestor from the event. (*Id.*) Plaintiffs, most of whom are disabled, allege that they simply wanted to attend the event to "pass out leaflets, have conversations with others at the event, and participate in a peaceful, open dialogue about issues facing people with disabilities." (*Id.* at PageID.2.)

On the day of the event, some Plaintiffs gathered at a nearby corner, carrying a banner for the National Federation of the Blind, signs with messages, and leaflets they intended to distribute. Sgt. Held approached and told the group that they could not go beyond the Austin Blair statue, which is located on the Capitol Grounds and within the permitted event area, because the event was private and the organizers did not want a disturbance. (*Id.* at PageID.11.) The situation came to a head as the group attempted to approach the event and were barred by the MSP officers. Plaintiffs told the officers that they were invited to, and wanted to, attend the event, but that the officers prevented Plaintiffs from entering both by physically blocking passage and, subsequently, placing metal barricades in front of Plaintiffs. (*Id.* at PageID.13.)

Plaintiff Harcz eventually attempted to get around the barricades. Harcz, who is legally blind, claimed he used his cane and hands to feel his way around and past the barricade. The State Defendants claim that Harcz "became physical, charged the barrier, and resisted and obstructed a police officer." (*Id.* at PageID.14–15; ECF No. 43 at PageID.583.) Harcz claims that "[a]t no point" did he use his cane or body as a weapon or "assault, batter, wound, resist, obstruct, oppose, or endanger the officers." (ECF No. 1 at PageID.15.) Harcz was subsequently arrested, held in the State Capitol building for the duration of the event, and ultimately charged with a felony which alleged that Harcz "did assault, batter, wound, resist, obstruct, oppose, or endanger" the officers

3

and "knew or had reason to know [they] were performing [their] duties." (*Id.* at PageID.16.) Harcz alleges that four of the officers filed false police reports and that videos show the reports were inaccurate. (*Id.* at PageID.16-17.)

Defendant Sgt. Henriquez testified at a preliminary examination in Harcz's state criminal case, and his testimony was consistent with the State Defendants' claims in their motion. The state judge found probable cause that Harcz obstructed the officers by failing to comply, but Harcz argues that there was a lack of evidence and that the judge's determination was "[in error] and based on false and misleading evidence." (*Id.* at PageID.19.) Harcz further alleges that there was no crime because the police officers' commands, themselves, were unlawful, and it is not a crime to disobey unlawful orders. Ultimately, the charges against Harcz were dropped before trial. (*Id.* at PageID.19.)

## II. Motion Standard

Defendants' motions invoke different standards. MACIL has filed a motion to dismiss pursuant to Rule 12(b)(6), HAAI has filed a motion for summary judgment pursuant to Rule 56, and the State Defendants have filed a motion to dismiss, or in the alternative, for summary judgment. Because the Court considers only the pleadings and materials permitted on a motion to dismiss, the Court confines its analysis of all motions to the Rule 12(b)(6) standard. *See Frisch v. Nationwide Mut. Ins. Co.*, 553 F. App'x 477, 481 (6th Cir. 2014) ("In ruling on a motion to dismiss, this Court may consider [only] the [c]omplaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the [c]omplaint and are central to the claims contained therein." (internal quotation marks omitted) (alterations in original)).

In deciding a motion to dismiss, the Court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face" when deciding whether to dismiss a case under Fed. R. Civ. P. 12(b)(6). *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009). Although the plausibility standard is not equivalent to a "'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556, 127 S. Ct. at 1965). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief." *Id.* at 679, 129 S. Ct. at 1950 (quoting Fed. R. Civ. P. 8(a)(2)).

### III. Discussion

#### A. The Private Defendants, MACIL and HAAI

A claim under 42 U.S.C. § 1983 "'must satisfy two elements: 1) the deprivation of a right secured by the Constitution or laws of the United States and 2) the deprivation was caused by a person acting under color of state law.'" *Tahfs v. Proctor*, 316 F.3d 584, 590 (6th Cir. 2003) (quoting *Ellison v. Garbarino*, 48 F.3d 192, 194 (6th Cir. 1995)). Therefore, a plaintiff cannot typically bring a § 1983 case against a private party. *Id.*

There are three primary tests to determine whether a private party acts under color of state law. None of them is alleged by Plaintiffs. *Id.* at 591. Rather, Plaintiffs argue that MACIL and HAAI are liable via an exception to the three tests which applies when there is a conspiracy between the private party and a state actor. *Cooper v. Parrish*, 203 F.3d 937, 952 n.2 (6th Cir. 2000) ("If a private party has conspired with state officials to violate constitutional rights, then that

party qualifies as a state actor and may be held liable pursuant to § 1983."). There need not be an express agreement, and the alleged conspirators need not know the details of the plan: "[a]ll that must be shown is that there was a single plan, that the alleged coconspirator shared in the general conspiratorial objective, and that an overt act was committed in furtherance of the conspiracy that caused injury to the complainant." *Hooks v. Hooks*, 771 F.2d 935, 944 (6th Cir. 1985); *see also Memphis, Tenn. Area Local Am. Postal Workers Union v. City of Memphis*, 361 F.3d 898, 905–06 (6th Cir. 2004). Specifically, Plaintiffs argue that MACIL and HAAI, through their alleged representatives, Sarah Grivetti and Ellen Weaver, respectively, conspiratorially planned to exclude Plaintiffs from the event, and that the police did exclude them in furtherance of the conspiracy, causing injury.

In this Court's judgment, the exception would swallow the rule under Plaintiffs' rationale. Speaking with police officers about a possible concern is not a "meeting of the minds" sufficient to establish a conspiracy. *See Startzell v. City of Philadelphia*, 533 F.3d 183, 205 (3d Cir. 2008) (quoting *Adickes v. S.H. Kress & Co.*, 389 U.S. 144, 158, 90 S. Ct. 1598, 1609 (1970)). There must have been an agreement with a shared objective. *Memphis*, 361 F.3d at 905–06. Plaintiffs merely allege that Grivetti and Weaver spoke with, and alerted the police that there may be protestors at the event and that they did not want their event to be disrupted.

An event host, acting with a permit, has "the first Amendment right[] . . . to effectively convey the message of its event." *Startzell*, 533 F.3d at 198. As well, the government "has an interest in ensuring that a permit-holder can use the permit for the purpose for which it was obtained." *Id.* Accordingly, the ADA event organizers appropriately expressed their concern to the police that their right to speak could be at risk from disruptive protestors. Plaintiffs' allegations fail to show that the organizers' conversations with the MSP officers constituted a meeting of the

6

minds as to approaches, if any, the police should take. To hold otherwise could create a chilling effect and scare private citizens from reaching out to police with their concerns.

In sum, Plaintiffs failed to allege a sufficient factual basis to establish that MACIL and HAAI conspired with the police to exclude Plaintiffs from the ADA event. Therefore, Plaintiffs cannot sue private actors MACIL and HAAI pursuant to § 1983.

Accordingly, Plaintiffs' claims against Defendants MACIL and HAAI will be dismissed.

**B. First and Fourteenth Amendment Claims—Qualified Immunity**

The State Defendants assert that they are entitled to qualified immunity on Plaintiffs' free speech and equal protection claims. "Under the doctrine of qualified immunity, 'government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Phillips v. Roane Cnty.*, 534 F.3d 531, 538 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982)). Once a defendant raises the qualified immunity defense, the burden shifts to the plaintiff to demonstrate that the defendant officer violated a right so clearly established "that **every** 'reasonable official would have understood that what he [was] doing violate[d] that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741, 131 S. Ct. 2074, 2083 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034, 3039 (1987)). The analysis entails a two-step inquiry. *Martin v. City of Broadview Heights*, 712 F.3d 951, 957 (6th Cir. 2013). First, the court must "determine if the facts alleged make out a violation of a constitutional right." *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 232, 129 S. Ct. 808, 815–16 (1982). Second, the court asks if the right at issue was "'clearly established' when the event occurred such that a reasonable officer would have known that his conduct violated it." *Id.* (citing *Pearson*, 555 U.S. at 232, 129 S. Ct. at 816). A court may address

these steps in any order. *Id.* (citing *Pearson*, 555 U.S. at 236, 129 S. Ct. at 818. Thus, an officer is entitled to qualified immunity if either step of the analysis is not satisfied. *See Citizens in Charge, Inc. v. Husted*, 810 F.3d 437, 440 (6th Cir. 2016).

In order for a right to be clearly established, it must be established "in a 'particularized' sense so that the 'contours' of the right are clear to a reasonable official." *Reichle v. Howards*, 566 U.S. 658, 665, 132 S. Ct. 2088, 2094 (2012) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034, 3039 (1987)). "[T]he clearly established law must be 'particularized' to the facts of the case," and "in the light of pre-existing law the unlawfulness must be apparent." *White v. Pauly*, -- U.S. --, 137 S. Ct. 548, 552 (2017) (quoting *Anderson*, 483 U.S. at 540, 107 S. Ct. at 3049). In order for a reasonable official to understand that he or she could violate a clearly established right, the courts "do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft*, 563 U.S. at 741, 131 S. Ct. at 2083.

"[A] plaintiff must identify a case with a similar fact pattern that would have given 'fair and clear warning to officers' about what the law requires." *Arrington-Bey v. City of Bedford Heights*, 858 F.3d 988, 993 (6th Cir. 2017) (quoting *White*, 137 S. Ct. at 551). In *Arrington-Bey*, the court noted that the Supreme Court has "reminded us" that existing precedent must clearly establish the unlawfulness of the particular conduct, and a high level of generality will not do. *Id.* at 992–93. This Court is particularly cognizant of these exacting standards. In a fairly recent case involving the issue of whether police participation in a private individual's seizure of a vehicle constituted state action, this Court held that the defendant officers were not entitled to qualified immunity because the Sixth Circuit's prior case law clearly established that the officers' conduct was unlawful. On appeal, a unanimous Sixth Circuit panel affirmed. *Middaugh v. City of Three*

*Rivers*, 629 F. App'x 710 (6th Cir. 2015). Subsequently, the Supreme Court vacated the judgment and remanded to the Sixth Circuit for further consideration in light of *Mullenix v. Luna*, __ U.S. __, 136 S. Ct. 305 (2015) (per curiam). *Piper v. Middaugh*, 136 S. Ct. 2408 (2016). On remand, the same panel concluded that the law was not clearly established because there was "sufficient daylight between the Officers' conduct . . . and the conduct in [the prior Sixth Circuit cases]" such that they did not "'apply with obvious clarity to [this] specific conduct.'" *Middaugh v. City of Three Rivers*, 684 F. App'x 522, 530 (6th Cir. 2017) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741, 122 S. Ct. 2508, 2516 (2002) (alteration in original)).

As explained more fully below, the Court's qualified immunity analysis begins, and ends, with the second step because the law, particularly in the Sixth Circuit, was not so clearly established that the State Defendants had fair notice that their actions were unlawful.

The First Amendment "offers sweeping protection that allows all manner of speech to enter the marketplace of ideas." *Bible Believers v. Wayne Cnty*, 805 F.3d 228, 243 (6th Cir. 2015). "It is also common ground, however, that the First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired." *Heffron v. Int'l Soc. For Krishna Consciousness, Inc.*, 452 U.S. 640, 647, 101 S. Ct. 2559, 2564 (1981). To determine whether a plaintiff's First Amendment free speech rights have been violated, courts apply a three-step analysis. First, the court determines whether the conduct in question is protected speech. Second, the court identifies the nature of the forum, *i.e.*, whether it is public or nonpublic. Third, the court asks "whether the justifications for exclusion from the relevant forum satisfy the requisite standard." *Saieg v. City of Dearborn*, 641 F.3d 727, 734–35 (6th Cir. 2011) (quoting *Cornelius v. NAACP Legal Def. and Educ. Fund, Inc.*, 473 U.S. 788, 797, 105 S. Ct. 3439, 3446 (1985)).

9

There is no dispute that Plaintiffs' speech concerning ADA issues is protected by the First Amendment or that the Capitol grounds is a public forum. *See ACT-UP v. Walp*, 755 F. Supp. 1281, 1287 (M.D. Pa. 1991) ("In general, the grounds and buildings of state and federal capitol complexes and similar buildings have consistently been held to be public fora.") (citing cases). Thus, any restriction on speech must have been either a reasonable time, place, and manner regulation or "narrowly drawn to accomplish a compelling governmental interest." *Saieg*, 641 F.3d at 734 (quoting *United States v. Grace*, 461 U.S. 171, 177, 103 S. Ct. 1702, 1707 (1983)). A time, place, and manner restriction must be content neutral, narrowly tailored to serve a significant government interest, and leave open ample alternatives of communication. *Id.* at 735.

The restriction at issue here is the MSP officers' decision to prevent Plaintiffs from accessing the event beyond the Austin Blair statue.[1] Although Plaintiffs argue that the MSP officers targeted Plaintiffs solely because of their speech, Plaintiffs' own allegations belie this assertion. That is, Plaintiffs allege that Weaver and Grivetti told Defendants Boucher, Held, and Henriquez that protestors were planning to attend the event and they were concerned that the protestors would disrupt the event. (ECF No. 1 at PageID.9–10.) Plaintiffs further allege that Defendant Held told Plaintiffs that they would not be allowed past the Austin Blair statue because the event organizers did not want a disturbance. (*Id.* at PageID.11.) As Plaintiffs describe it, the MSP officers limited Plaintiffs' access in order to prevent a disturbance, not because they disagreed with the content of Plaintiffs' speech. Plaintiffs admit that they were permitted to remain on the Capitol Grounds and that they were not precluded from expressing themselves from the Austin Blair statue—within the designated event area. Thus, the only viable inference arising from Plaintiffs' factual allegations is that the MSP officers limited Plaintiffs' access in order to prevent

---

[1] A police officer's orders and commands affecting speech are reviewed under the same rubric as written ordinances or regulations. *See Pouillon v. City of Owosso*, 206 F.3d 711, 713, 717–18 (6th Cir. 2000).

them from disturbing the event, not because they disagreed with the content of Plaintiffs' speech. *See Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S. Ct. 2746, 2754 (1989) ("The government's purpose is the controlling consideration. A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others.") (citing *Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 47–48, 106 S. Ct. 925, 929–30 (1986)); *see also Marcavage v. City of Philadelphia*, 481 F. App'x 742, 746 (3d Cir. 2012) ("While the officers did necessarily consider the content of Marcavage's speech when deciding to impose restrictions on him that would separate his counter-protest from event participants, this does not make the restrictions content-based.").

As for the validity of the restriction, Plaintiffs fail to cite any case from the Supreme Court or the Sixth Circuit addressing the issue: whether police officers may take preemptive action to ensure a permit-holder's right to convey its message at its own event without disruption from protestors, even though the protestors have not yet disturbed the event and may never do so. Are police officers allowed to intervene in order to preserve the peace and prevent disruption of a permitted event? Can the police act on the event organizer's stated fear that there *may* be a disturbance? Maybe not because such preemptive action may be instigated despite the unknown fact of whether there was a true threat of a disturbance. Or, in order to be safe from a § 1983 claim, do the police officers have to wait in order to be absolutely sure that a disturbance of a permitted meeting may occur? Maybe not because having to break up a disturbance after it has started risks injury to the police as well as attendees at the permitted event. Who do the police believe regarding the threat of a disturbance, and what do they do about it—act or wait? And if there is a disturbance and injuries after the warning by event organizers, do the officers risk liability to those in

attendance for *not* having *protected* their right to free speech and personal safety? This is a "Damned if you do, and damned if you don't" scenario.

The cases Plaintiffs cite address different issues. For example, *Saieg v. City of Dearborn*, 641 F.3d 727 (6th Cir. 2011), dealt with a restriction permitting leafletting only from a booth at a festival covering an eight-block area. *Id.* at 730–32. The court had no reason to address the competing First Amendment interests of the permit-holder and others seeking to convey a message within the permitted area. Similarly, *Bays v. City of Fairborn*, 668 F.3d 814 (6th Cir. 2013), concerned the validity of a rule prohibiting solicitation other than from a booth at a fair held in a park. *Id.* at 818. *Bays* did not consider a permit-holder's First Amendment right to convey its message in an effective manner. *Bible Believers v. Wayne County*, 805 F.3d 228 (6th Cir. 2015), decided by the Sixth Circuit after the events in the instant case occurred, involved the same festival at issue in *Saieg*, but considered the application of the "heckler's veto" doctrine, which typically comes into play when the police silence a speaker in response to an angry, hostile crowd that disagrees with the speaker's message. *Id.* at 234. The instant case does not involve a "heckler's veto."

*Parks v. Finan*, 385 F.3d 694 (6th Cir. 2004), and *Parks v. City of Columbus*, 395 F.3d 643 (6th Cir. 2005), two cases brought by the same plaintiff, involved circumstances more similar to those in the instant case, but still are not similar enough to have afforded Defendants fair warning that their conduct was unlawful. In *Parks v. Finan*, Parks sought to preach and distribute religious material on the Ohio State Capitol grounds on two separate occasions. Both times, state police officers told Parks that he would have to leave the grounds because he did not have a permit as required by state regulations. 385 F.3d at 696–97. On the first occasion, another group that had obtained a permit was conducting a rally on the grounds, but there was no indication that Parks

disturbed the group's event, the group did not complain about Parks, and the group's permit did not give it the exclusive right to use any portion of the grounds. *Id.* at 696. The presence of a permit-holder played no part in the court's analysis: "There is no indication in the record that Parks disrupted POET's [the group] rally or that the POET organizers felt that Parks's presence imposed upon the protest." [2] *Id.* at 705. In *Parks v. City of Columbus*, Parks attended an arts festival wearing a sign bearing a religious message. The arts festival was open to the public and was held pursuant to a non-exclusive permit issued by the city. 395 F.3d at 645–46. As Parks was distributing religious literature within the permitted area, a police officer told Parks that the event sponsor did not want Parks at the event, and instructed Parks to move beyond the barricade. *Id.* at 646. The Sixth Circuit concluded that the officer's exclusion of Parks violated Parks's First Amendment rights. In particular, the court noted that "Parks's speech was not interfering with the permit holder's message," and the city failed to show why the permit-holder wanted Parks removed or that the permit-holder had a policy against distribution of literature during the event. *Id.* at 652, 654. *Parks v. City of Columbus* would control in this case if the MSP officers had acted at their own behest. But this is not what Plaintiffs allege. Plaintiffs allege that the MSP officers acted because the event organizers—who were aware that Plaintiffs were upset with certain aspects of the event—were concerned that Plaintiffs would disrupt it. Thus, no Sixth Circuit case gave the State Defendants "fair warning." *Baynes v. Cleland*, 799 F.3d 600, 612–13.

---

[2] The defendants in *Parks v. Finan* argued that the Sixth Circuit's decision in *Sistrunk v. City of Strongsville*, 99 F.3d 194 (6th Cir. 1996), was controlling. In *Sistrunk*, the defendant city issued a permit for a Bush-Quayle '92 campaign rally. The permit gave the organization and its members and invitees exclusive use of the premises for a limited time, and provided that the committee was authorized to restrict use of the premises by invitation. Members of the public were invited to attend, but were required to obtain admission tickets. *Id.* at 196. Citing *Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston*, 515 U.S. 557, 115 S. Ct. 2338 (1995), the court analogized the political rally to a parade that sought to convey a message as a cohesive unit. *Id.* at 198–99. The court in *Parks* distinguished *Sistrunk* because no organization had been granted an exclusive permit to use the grounds for a limited period, and, in contrast to *Sistrunk*, police officers, rather than an exclusive permit-holder, determined the messages that should be excluded. *Id.* at 704–05. In the instant case, Defendants do not argue that the ADA event, which was open to the public, was akin to a parade or a political rally held to convey a collective message such that *Sistrunk* would apply.

*Startzell v. City of Philadelphia*, 533 F.3d 183 (3d Cir. 2008) is perhaps closest on the facts. In *Startzell*, the City of Philadelphia issued a permit to a group called Philly Pride to hold a gay pride festival known as OutFest. The festival was held in an area bordered by several streets and included "stages and dance areas, sport and amusement areas, a flea market, and paying vendors from various organizations," all of which was free and open to the public. *Id.* at 189. Members of an organization known as Repent America and led by Michael Marcavage sought to attend OutFest to convey their message that homosexuality is sinful. Prior to the festival, the city rejected Philly Pride's request to exclude Marcavage's group from the event area because the event was an open street event. *Id.* at 189–90. After entering the event, the protestors stood near the main stage, where they began to make noise. When the program began, the police instructed the protestors to move farther up the block, and the protestors complied. Shortly thereafter, the police again told the protestors to move because they were blocking access to vendor booths. The protestors refused to move and were arrested. *Id.* at 191.

On appeal from summary judgment in favor of the city, the Third Circuit began its analysis by clarifying that it was not holding that Philly Pride "had a correlative right to exclude from the OutFest those who h[e]ld contrary, indeed antagonistic, viewpoints," simply because the city had granted Philly Pride a permit. *Id.* at 193. Citing *Parks v. City of Columbus*, the court observed that "OutFest took place in the streets and sidewalks of Philadelphia, an undisputed quintessential public forum," and "[t]he issuance of a permit to use this public forum does not transform its status as a public forum." *Id.* at 196. However, the court also recognized that police officers are not without authority to enforce valid permits: "The principle of content neutrality does not divest police officers of the ability to enforce valid permits and to ensure that permitted speech is allowed to take place." *Id.* at 198. Thus, the court explained, although Marcavage and his group had a

14

First Amendment right to convey their message in a public forum, their rights were not superior to those of the permit-holder:

> The right of free speech does not encompass the right to cause disruption, and that is particularly true when those claiming protection of the First Amendment cause actual disruption of an event covered by a permit. The City has an interest in ensuring that a permit-holder can use the permit for the purpose for which it was obtained. This interest necessarily includes the right of police officers to prevent counter-protestors from disrupting or interfering with the message of the permit–holder. Thus, when protestors move from distributing literature and wearing signs to disruption of the permitted activities, the existence of a permit tilts the balance in favor of the permit-holders.

*Id* at 198–99.

Although *Startzell* suggests that, when a permitted event held in a public forum is open to the public, police officers cannot limit or deny protestors access to the event space unless actual disruption occurs, a subsequent unreported case from the Third Circuit indicates that *Startzell* should not be read as establishing an absolute rule allowing inclusion. In *Marcavage v. City of Philadelphia*, 481 F. App'x 742 (3d Cir. 2012), Marcavage again sued the City of Philadelphia for violating his rights to convey his message condemning homosexuality at four separate events. Marcavage claimed that the city violated his rights when police officers moved his group away from event participants outside of the boundaries of the permitted areas in order to keep the peace and avoid physical confrontations. *Id.* at 744–45. Marcavage sought to distinguish *Startzell* on several grounds, including that he was not being disruptive. The court said that even if Marcavage was not being as disruptive as he had been in *Startzell*, the amount of disruption was "merely a difference of degree," but, it added, "[i]n any event, police officers are not required to wait for actual disorder before imposing minimal restrictions." *Id.* at 748 (citing *ACORN v. St. Louis Cnty.*, 930 F.2d 591, 596 (8th Cir. 1991) ("[t]he government need not wait for accidents to justify safety

15

regulations.")). Thus, *Marcavage* suggests, *albeit* in dicta, that police officers need not wait for a disruption before imposing some restrictions on speech.

One other consideration is worth noting with regard to whether the law was clearly established on the instant facts. The Supreme Court has observed that "consideration of a forum's special attributes is relevant to the constitutionality of a regulation since the significance of the governmental interest must be assessed in light of the characteristic nature and function of the particular forum involved." *Heffron*, 452 U.S. at 650–51, 101 S. Ct. at 2565. The Court explained:

> [I]t is clear that there are significant differences between a street and the fairgrounds. A street is continually open, often uncongested, and constitutes not only a necessary conduit in the daily affairs of a locality's citizens, but also a place where people may enjoy the open air or the company of friends and neighbors in a relaxed environment. The Minnesota Fair, as described above, is a temporary event attracting great numbers of visitors who come to the event for a short period to see and experience the host of exhibits and attractions at the Fair. The flow of the crowd and demands of safety are more pressing in the context of the Fair. As such, any comparisons to public streets are necessarily inexact.

*Id.* at 651, 101 S. Ct. at 2566.

Most of the cases discussed above—*Saieg*, *Bays*, *Bible Believers*, *Parks v. City of Columbus*, and *Startzell*—involved festivals and celebrations that took place in the open streets and on park grounds and, thus, were able to accommodate many speakers communicating different messages. In contrast, the East half of the Michigan Capitol Grounds, the area covered by the permit where the temporary ADA event was held, is a much more compact venue, leaving less space for discordant speakers without a likely disruption of the event and few alternatives for accommodating such speakers, such as telling them to move up the block, as in *Startzell*.[3] The foregoing cases did not address venues with similar attributes and under similar circumstances,

---

[3] One of the persons blocked from joining the main crowd at the ADA event was carrying a bullhorn.

16

and thus, would not have made clear to the MSP officers that they were violating Plaintiffs' rights by limiting their access to the event.

Plaintiffs' equal protection claim is subject to dismissal for similar reasons. The Equal Protection Clause of the Fourteenth Amendment is "essentially a direction that all persons similarly situated be treated alike." *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439, 105 S. Ct. 3249, 3254 (1985). To establish an equal protection claim, "a plaintiff must adequately plead that the government treated the plaintiff disparately as compared to similarly situated persons and that such disparate treatment either burdens a fundamental right, targets a suspect class, or has no rational basis." *Ctr. For Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 379 (6th Cir. 2011) (internal quotation marks omitted). In Count II, Plaintiffs allege that the State Defendants' speech restrictions "prevented plaintiffs from expressing a message based on its content and viewpoint, thereby denying the use of a forum to those whose views defendants found unacceptable." (ECF No. 1 at PageID.21.) When, as here, a plaintiff's equal protection claim mirrors a First Amendment claim, the claims rise and fall together. *See Vukadinovich v. Bartels*, 853 F.2d 1387, 1391–92 (7th Cir. 1988); *World Outreach Conference Ctr. v. City of Chicago*, 234 F. Supp. 3d 904, 914 (N.D. Ill. 2017) (noting that the plaintiff's First Amendment and equal protection claim "merely present[ed] different legal theories in support of the same relief based on the same conduct"). In any event, for the reasons set forth above, the Court concludes that the law was not clearly established such that a reasonable officer in the State Defendants' position would have known that his actions were objectively unreasonable. *See Scott v. Clay Cnty.*, 205 F.3d 867, 877 (6th Cir. 2000).

In sum, the Court emphasizes that it has not made a determination of the merits of Plaintiffs' First Amendment and equal protection claims, but instead disposes of the State

17

Defendants' qualified immunity argument on the "clearly established" prong. And, because the Court finds "sufficient daylight" between the circumstances in the instant case and those in the cases discussed above, such that they did not provide obvious clarity to the State Defendants regarding the lawfulness of their actions, qualified immunity is appropriate. *Middaugh*, 684 F. App'x at 530.

**C.     Plaintiff Harcz's Individual Claims**

Plaintiff Harcz has alleged both federal and state law claims against certain police officers based on his arrest and subsequent prosecution. He alleges false arrest, false imprisonment, and malicious prosecution. An arrest without probable cause is an unreasonable seizure in violation of the Fourth Amendment. *Ingram v. City of Columbus*, 185 F.3d 579, 592–93 (6th Cir. 1999). "To determine whether an officer had probable cause to arrest an individual, we examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." *Maryland v. Pringle*, 540 U.S. 366, 371, 124 S. Ct. 795, 800 (2003) (internal quotation marks omitted). Analyzing probable cause must be done "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Klein v. Long*, 275 F.3d 544, 550 (6th Cir. 2001) (citations omitted) (internal quotation marks omitted). Lack of probable cause is a required element in a malicious prosecution claim. *Sykes v. Anderson*, 625 F.3d 294, 308–09 (6th Cir. 2010). Malicious prosecution claims can be brought against police officers if a plaintiff alleges that a misleading police report influenced the state court's determination of probable cause for arrest and prosecution. *See Darrah v. City of Oak Park*, 255 F.3d 301, 312 (6th Cir. 2001); *Adams v. Metiva*, 31 F.3d 375, 388 (6th Cir. 1994).

18

Defendants argue that Plaintiff Harcz is collaterally estopped from challenging probable cause because the preliminary hearing for the state criminal charge against him resulted in a finding of probable cause. *See Darrah*, 255 F.3d at 310–11 (citing *Coogan v. City of Wixom*, 820 F.2d 170, 175 (6th Cir. 1987) ("where the state affords an opportunity for an accused to contest probable cause at a preliminary hearing and the accused does so, a finding of probable cause by the examining magistrate or state judge should foreclose relitigation of that finding in a subsequent § 1983 action")).

"[W]e must apply the state law of collateral estoppel when deciding whether the state court's determination of probable cause at the preliminary hearing has preclusive effect in [a] § 1983 action." *Id.* at 311 (citing *Haring v. Prosise*, 462 U.S. 306, 313, 103 S. Ct. 2368, 2373 (1983)). Michigan law applies issue preclusion when 1) the parties are identical between the two cases; 2) the earlier proceeding resulted in a valid, final judgment; 3) the same issue was actually litigated and determined in the earlier proceeding; 4) the party against whom collateral estoppel is asserted had a full and fair opportunity to litigate the issue in the earlier proceeding. *Id.* (citing *People v. Gates*, 434 Mich. 146, 156–57, 452 N.W.2d 627, 630–31 (1990)).

The issue presented here is different. Harcz alleges that the officers made false statements to the state judge and in their police reports; he does not dispute that the state court found probable cause. *Id.* Therefore, collateral estoppel does not apply. "However, if this court finds that there was probable cause to prosecute [a plaintiff], regardless of any alleged false statements made by [an officer], then [plaintiff] cannot make out a malicious prosecution claim under the Fourth Amendment." *Id.* at 312.

The video evidence does not clearly show Harcz trying to hit anyone,[4] but it does show Harcz feeling around the barricades and asking a fellow protestor whether he was filming before Harcz declared, "Fuck it, I'm going through." Harcz felt around the barricade and attempted to walk through. Whether he was aggressively pushing against the police officers, or the officers initiated the physical contact by aggressively pulling him through and handcuffing him, is not readily apparent in the videos. What is readily apparent in the videos is that Harcz was angry and prepared to resist the officers and their orders to stay behind the barricade.

Harcz argues that it is lawful for a citizen to disobey unlawful orders. That does not mean that a person who disagrees with a police officer is free to assault or batter that officer in the process. When viewing these facts from the perspective of a reasonable officer on the scene, rather than with the benefit of 20/20 hindsight, Harcz's actions provided adequate grounds to establish probable cause for the police officers to arrest him. Harcz's yelling, aggressive use of his walking cane, clearly-expressed intent to push through, and attempting to push through the officers provided adequate grounds to arrest, detain, and initiate a prosecution against him.

Accordingly, Harcz's individual claims will be dismissed.

### IV. Conclusion

For the foregoing reasons, the Court will grant Defendants' motions and dismiss Plaintiffs' complaint.

An Order consistent with this Opinion will enter.

Dated: January 2, 2018    /s/ Gordon J. Quist
GORDON J. QUIST
UNITED STATES DISTRICT JUDGE

---

[4] He did aggressively poke his walking cane at the barricade in an unreasonable manner and may have made contact with an officer, but viewing the facts most favorably to Harcz, it is not apparent that he was intending to hit the officers.