UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


_____

HARCZ, ET AL.,

        Plaintiff,

     v.                                    File No. 1:17-cv-112

BOUCHER, ET AL.,

        Defendants.
_____/


<u>Hearing</u>

Before


THE HONORABLE GORDON J. QUIST
United States District Court Judge
November 2, 2017


<u>APPEARANCES</u>

For Plaintiffs:        Julie Burnham Porter
                       Salvatore Prescott & Porter, PLLC
                       1010 Davis Street
                       Evanston, IL  60201
                       (312) 283-5711
                       Email:  Porter@spplawyers.com


For the Defendants     John G. Fedynsky
Boucher,               Michigan Department of Attorney General
Brocklehurst, Cook,    Civil Litigation, Employment & Elections
Davis, George, Held    525 W. Ottawa Street
Henriquez, Munroz,     P.O. Box 30736
Thomas, and            Lansing, MI  48909
Williams:              (517) 373-6434
                       Email:  Fedynskyj@michigan.gov

```
For the Defendants        Thomas A. Schramm
Handicapper Advocacy      Starr Butler Alexopoulos & Stoner, PLLC
Alliance, Inc.:           20700 Civic Center Drive, Ste. 290
                          Southfield, MI 48076
                          (313) 567-5921
                          Email:  Tschramm@starrbutler.com


For the Defendant         Gregory M. Meihn
Michigan Association       Foley & Mansfield, PLLP
Of Centers for            130 E. Nine Mile Road
Independent Living:       Ferndale, MI  48220
                          (248) 721-4200
                          Email:  Gmeihn@foleymansfield.com




Recorded By:              Digitally Recorded

Courtroom Clerk:          P. Bratt

Transcribed By:           Bonnie L. Rozema, CER-5571
                          (616) 878-9091
                          Email:  Rozemab1@comcast.net
```

TABLE OF CONTENTS


<u>WITNESS:</u>                                          <u>PAGE</u>

None




<u>EXHIBITS:</u>                                         <u>IDENTIFIED</u>

None

1    Grand Rapids, Michigan

2    Thursday, November 2, 2017 - 2:08 p.m.

3              THE COURT:  We're here on the case of Harcz --

4         is that how you pronounce his name?

5              MS. PORTER:  Yes, sir.

6              THE COURT:  v. Bow-cher?

7              MR. FEDYNSKY:  Boo-shay.

8              THE COURT:  Boo-shay.  Okay.  Boucher.

9         Arguments and motions to dismiss for summary judgment.  Can

10        I have the appearance of counsel, please?

11             MS. PORTER:  Yes, your Honor.  Julie Porter

12        present for the plaintiffs, three of whom are present in

13        court today.  Mr. Harcz is here, as is Eleanor Canter and

14        Brian Dian.

15             THE COURT:  I recognize them from some videos.

16             MS. PORTER:  Yes.  Yes, your Honor.

17             MR. FEDYNSKY:  Good afternoon, your Honor.

18        Assistant Attorney General John Fedynsky.  I'm here on

19        behalf of the individual State Defendants.

20             THE COURT:  Thank you.

21             MR. SCHRAMM:  Your Honor, Tom Schramm on behalf

22        of defendant Handicapper Advocacy Alliance, Inc.

23             THE COURT:  Thank you.

24             MR. MEIHN:  May it please this Court, your

25        Honor.  Greg Meihn on behalf of the Michigan Association of

1    Centers for Independent Living.

2                THE COURT:  Thank you.  Okay, let me tell you

3    where I'm coming from.  I've spent substantial time reading

4    the materials, doing a little bit of independent research.

5    I found it interesting, actually, you know, because of all

6    the things that are going on regarding freedom of speech in

7    the street, so to speak, and then meetings.  So it was an

8    interesting area of law.  I've had First Amendment cases

9    before, but none quite so dramatic as this particular one.

10                Like I said, I've spent a substantial amount of

11   time, and I'll start with -- and this is going to be more

12   of a conversation than standing up here and giving a speech

13   to me, because that would be just wasting time.

14                I'm going to start with telling the plaintiff

15   some of my problems, and you can stand up there,

16   Ms. Porter --

17                MS. PORTER:  Yes, your Honor.

18                THE COURT:  -- and respond to these.  I have

19   difficulty in bringing the two organizations, Michigan

20   Centers For Independent Living and Handicapper Advocacy

21   Alliance into the case.  And the reason is, as you well

22   know, under 42 United States Code Section 1983 you have to

23   be a state actor, and the only way I see you trying to get

24   around it, because they're not state actors, is a

25   conspiracy.  And here's the problem that I have.  Am I

1        right so far?

2                MS. PORTER:  Yes.

3                THE COURT:  Okay.  Then here's the problem I

4        have.  Basically, your argument boils down to if someone

5        talks to the police or makes a report to the police and the

6        police react thereto, that's a conspiracy.

7                For example, let's say that I'm watching my

8        neighbor's house and I don't know their whole family and I

9        see someone trying to break into the house and I call the

10       police because that's what I'm supposed to do.  It turns

11       out that it's the neighbor's son coming home from college

12       or something.  Am I a conspirator for calling the police

13       when the person that was breaking into the house was just a

14       college kid that lost his key?  What's the difference

15       between that set of facts and your case?

16               MS. PORTER:  The answer to your question is no,

17       you are not a conspirator, and that is different from our

18       set of facts because we allege more than simply a report to

19       the police.  If what had happened is that representatives

20       of the two organizational defendants simply alerted police,

21       "We believe there may be protestors at our event.  Thank

22       you very much," hang up the phone, we would not have

23       brought them into this case and alleged that they were

24       co-conspirators.  Here, however, our prefiling factual

25       development suggested to us that it was a more concerted

1    activity than that.  There were multiple discussions, even

2    meetings in between the organizational defendants and the

3    police, culminating in a meeting the morning of the event

4    where we allege that representatives of the two

5    organizational defendants sat down with the representative

6    from Michigan State Police and they agreed that the way

7    this would be handled is that the protestors who they

8    expected would be kept out of the event.  It's more than

9    just, you know, here's our tip, you do what you want.  It

10   was an expression, "We don't want these people disrupting

11   the event.  What are we going to do about it?"  And they

12   reached an agreement that this is what they would do.  The

13   Michigan State Police would show in force and would keep

14   these people from coming in.

15            If it had just been a tip, I agree with your

16   Honor that that would be enough to show concerted activity,

17   but we allege here that it was more --

18            THE COURT:  Was it the full --

19            MS. PORTER:  -- significant.

20            THE COURT:  The cases that I've read involving

21   the conspiracy theory, which is an exception to all the

22   general rules --

23            MS. PORTER:  Yes.

24            THE COURT:  -- showed a much different kind of

25   participation by the individuals who are not police

1    officers.  They might have been informants for the police,

2    for example, or they might have been a paid undercover

3    person that was not a police officer, or they might have

4    been a physician hired by the Michigan Department of

5    Corrections to take work that was ordinarily done by

6    physicians employed by the Michigan Department of

7    Corrections, those kinds of things.  But when just talking

8    to the police and when the police have full authority to

9    take all the acts and the other -- the organizational

10   defendants did not have any authority at all, I have a

11   difficult time.  I still do.  I understand your argument,

12   but we'll see what the other side says, but do you want to

13   say anything more about that?

14                THE COURT:  MS. PORTER:  The only thing that I'll add, your

15   Honor, is that I think one thing that does make this a bit

16   different from the scenario that you're talking about is

17   the level of detail that we have alleged in the complaint

18   concerning the interaction between the nongovernment

19   organizations on one hand and the State Police on the

20   other.  I think that separates it from the situations that

21   you're talking about.  And at this stage we do believe that

22   that's something that we should be exploring in discovery.

23   I think at a summary judgment stage if -- if --

24                THE COURT:  What would you discover?  That was

25   the next question I was going to ask.

1          MS. PORTER:  Yes, your Honor.

2          THE COURT:  Actually.

3          MS. PORTER:  On this issue?

4          THE COURT:  Yes.  What further discovery would

5    you want?  For example, if you have a motion for summary

6    judgment, and one of the motions is for summary judgment,

7    and if you want discovery for a period of time, and here we

8    have motions to dismiss, we'll treat them all that way.

9          MS. PORTER:  Correct.

10          THE COURT:  You have a motion for summary

11    judgment, and I don't know what the law is on motion to

12    dismiss.  According to Sixth Circuit precedent, you have to

13    have sort of a plan.  You have to tell the judge what

14    you're going to do, what discovery do you want.

15          MS. PORTER:  Right.  So on the issue with HAAI,

16    they allege that they should be out, among other reasons,

17    because Ellen Weaver, who we name in the complaint, did not

18    in fact act as their representative.  In our prefiling

19    investigation, and this was part of the affidavit on

20    Exhibits that I submitted, we obtained police reports from

21    Michigan State Police that did name her and clearly viewed

22    her as acting on the organization's behalf, not only in

23    making reports to the police about what was happening, but

24    in also sharing detailed information, such as, you know, we

25    had a permit for this bus.  Now if the bus comes, you know,

1          we don't want to allow them to park there, which we

2          understand to be, again, seeking agreement from the police

3          to help stop, you know, this bus from parking in front of

4          the capitol building.

5                    We would, among other things, take discovery on

6          Ellen Weaver's actual relationship to HAAI at that point in

7          time, whether she was in fact acting in ways that under the

8          law constitute an agency relationship, such as the

9          organization would be held responsible for her activities.

10         We also specifically described that we would take discovery

11         about the actual discussions between the State Police on

12         one hand and these nonorganizational defendants.  We have

13         some police reports that make certain statements.  I want

14         to test those reports.  I want to find out from the parties

15         who participated in them what was said.  I want to find out

16         if there were additional discussions that were not

17         memorialized in police reports.  I will tell the Court

18         right now I don't have any knowledge of such discussions.

19         I'm not telling the Court that I believe that there were

20         secret conversations not memorialized, but I think the

21         prefiling investigation we did that turned up those reports

22         give us a very healthy curiosity about the back-and-forth

23         that occurred, which would be very relevant to our claim of

24         a conspiracy.

25                    THE COURT:  Okay.  Thank you.

1          MS. PORTER:  Thank you, judge.

2          THE COURT:  Mr. Schramm?

3          MR. SCHRAMM:  Yes, your Honor.

4          Your Honor, I think you hit the nail on the head

5     with respect to a key problem in the plaintiff's action

6     against Handicapper Advocacy Alliance, HAII, [sic] that

7     also spills over to the other defendants in this action.

8          The alleged conspiracy is nothing more than a

9     conversation or two among various defendants with the

10    police department.  In fact, in this case it's even more

11    removed from a conspiracy with respect to my client, HAII.

12    In fact the allegation in the complaint is only that Ellen

13    Weaver spoke with the police and said that she did not want

14    the protestors to obstruct the event.  That is what she

15    said to the police in the early conversation.

16          THE COURT:  Who was it that wanted -- didn't

17    want that bus to park there?  Was that Ms. Weaver as well?

18    I forget, actually.  That's why I'm asking.

19          MR. SCHRAMM:  It is referenced in the police

20    report that she did not want the bus to stop there.

21    However, there is, as I understand it, no dispute in this

22    case that the bus parked at the site requested, and the

23    plaintiffs exited the bus and came onto the entranceway to

24    the capitol grounds.  So I don't see a case here with

25    respect to parking a bus.  I haven't seen any allegations

—11—

1    of a conspiracy regarding parking a bus.  That came out of

2    left field.  I heard an oral argument here today, but it

3    does not fit within the alleged conspiracy that the

4    plaintiff has presented here.  The plaintiff has filed a

5    complaint.  That complaint alleges a conversation where

6    Ellen Weaver said she didn't want the protestors to

7    obstruct the event.  She did not then direct the police or

8    agree with the police that the bus would not be parked at

9    that location.  There's no allegation of that.

10            In addition, what we have here is within the

11   complaint some key admissions.  We have an admission at

12   paragraph 41 of the complaint, act one of course in this

13   action, that in a separate conversation not involving

14   Ms. Weaver or my client, Sergeant Held, one of the State

15   defendants in this action, assured Sara Grivetti, a

16   representative of the other defendant, MACIL, that no one

17   would be permitted to protest at the event.  So that

18   conversation was had not with Ms. Weaver or my client, not

19   with anyone attributed to my client.  That conversation was

20   had, as alleged in the complaint, with two other defendants

21   in this action.

22            Following that conversation, as alleged in the

23   complaint, the State Police met and created an operational

24   plan, and the decision was made that the police would be

25   present at the AGA event.  So once again, if there were a

1       conspiracy, and I would argue to this Court there was not,

2       that conspiracy was launched in what I've just described a

3       fact pattern of a conversation, decisions, and an

4       operational plan formed all without Ms. Weaver or my

5       client's involvement.  My client simply saying preceding

6       this plan, if you will, as it would be alleged in the

7       complaint, my client simply saying to the police, "I don't

8       want them to obstruct the event" is not a conspiracy.

9               In addition, what happened after that

10      operational plan was put into place is that just before the

11      event itself, shortly before the event in that morning,

12      there was a meeting, as alleged in the complaint, with

13      Ms. Weaver, Ms. Grivetti of defendant MACIL, and the State

14      Police representative in which they had a discussion

15      regarding how the police were going to be implemented, but

16      the police were already there.  The overt act was already

17      accomplished, if there were a conspiracy.  The police

18      certainly weren't called on the phone an hour and a half

19      before the event.  They were there based on the operational

20      plan that is alleged to have happened preceding and without

21      my client's involvement.

22               THE COURT:  Okay.

23               MR. SCHRAMM:  This entire discussion I've just

24      presented with respect to the alleged conspiracy has a

25      second layer of difficulty that has not effectively been

1          rebutted by the plaintiff in this case.

2                    THE COURT:  Well, is that that she wasn't even

3          employed by --

4                    MR. SCHRAMM:  Yes, your Honor.

5                    THE COURT:  Okay.  That's what I was going to

6          raise.  That's exactly the question I was going to ask.  Go

7          ahead.

8                    MR. SCHRAMM:  Yes, your Honor.  And I've

9          presented affidavits from the executive director, Mark

10         Pierce, of my client, as well as Ms. Weaver herself,

11         describing how she was on a volunteer committee.  And that

12         volunteer committee created a lot of the organization

13         behind the ADA event.  That volunteer committee was not my

14         client.  And in this case the plaintiff did not conduct

15         discovery, request a deposition after I filed my motion,

16         but in addition, and I think it's very important, is that

17         in order to request additional discovery, the plaintiff

18         needs to identify why they were unable to present to this

19         Court information raising a genuine issue of material fact.

20         And in this case the plaintiff has never explained why

21         Mr. Harcz, who was on that same volunteer committee with

22         Ms. Weaver, did not present an affidavit saying Ms. Weaver

23         was a representative of my client.

24                   There's no affidavit.  There's no reason why

25         there's no affidavit other than it's just not true.

1     Because Ms. Weaver was not a representative of my client,

2     and Mr. Harcz was on the volunteer committee.  And if he

3     had a different opinion or the plaintiffs had a different

4     opinion who had many interactions, as alleged in the

5     complaint, they should have presented an affidavit saying

6     we didn't just file a complaint saying Ms. Weaver was a

7     representative of HAII, we actually believe that because X.

8              There is no evidence to that effect, and the

9     plaintiff had a burden to demonstrate to this Court why

10    they could not come to this Court with sufficient

11    information and need to conduct additional discovery.

12              THE COURT:  Okay, thank you.

13              MR. SCHRAMM:  Thank you, your Honor.

14              MR. MEIHN:  Your Honor, may I address that --

15              THE COURT:  Yup.  Definitely.

16              MR. MEIHN:  -- question on behalf of --

17              THE COURT:  You were the next guy on the list.

18    Mr. Meihn, is it?

19              MR. MEIHN:  It is.  Correct, your Honor.

20              THE COURT:  All right.

21              MR. MEIHN:  If I could just have the Court back

22    up for a moment.  Plaintiff's counsel admitted in her

23    statements to you the very reason why dismissal is

24    appropriate as to all the defendants, but specifically

25    MACIL.  And the reason is is, she thinks she wants to find

1      information, she thinks there could be information, maybe

2      this.  She's missed out on, unfortunately, judge, that on

3      Iqbal and Twombly they had an obligation to promote facts

4      that are sufficient enough to give a belief that there is a

5      basis well seated in the case.  On the state after claim

6      that pled nothing as it relates to MACIL, other than the

7      fact that they say, well, Grievant and Sergeant Hand had

8      agreed upon that the protestors would be held at a certain

9      place.

10             Now let's back up for a moment.  That's it.

11     That all the rest of the allegations of talking to them

12     give no evidence of a conspiratorial nature.  But here is

13     the other thing that we're not talking about and we should.

14     First of all, MACIL has -- MACIL has a right, their own

15     first amendment rights play a role here.  They just, it's

16     not the plaintiffs that get to say our First Amendment

17     rights trump over everybody else's.  And there's nothing

18     conspiratorial about MACIL and grievant going up to the

19     police and saying, "I believe something's going to happen."

20     In fact if we didn't do that, if we -- if we held that was

21     conspiratorial, everybody, judge, would be deemed to be

22     somehow part of the process.

23             THE COURT:  That was my point with counsel,

24     Ms. Porter, that there's somewhere there's a line to be

25     crossed.  It is correct in my judgment that merely talking

—16—

1      to the police does not make one a conspirator, especially

2      when you leave the decision as to what's going to occur up

3      to up to the police?  It's a tricky way to -- tricky thing

4      to articulate because you start getting into legal

5      conclusions as well as factual actions.

6            MR. MEIHN:  You do.  And there's one other thing

7      that helps you with that, your Honor.

8            THE COURT:  Yeah.

9            MR. MEIHN:  And what helps you with that is the

10     fact when you look at the Startzell and the City of Memphis

11     cases that are cited and you started to go down that road,

12     when it talks -- those cases talked about what the inner

13     reaction was, what the proof was necessary to create a

14     conspiracy.  Nothing like that is here, other than a

15     citizen who is putting on an event who hears that this may

16     be subject to disruption and protest simply makes the

17     police aware.

18            Now what is also important in an admission in

19     this case is that nowhere in plaintiff's complaint do they

20     allege, nor can they, that grievant or MACIL was aware of

21     what the state was going to do, the erection of the steel

22     barriers, the action that they had taken when he tried to

23     come through the barriers, they weren't part of that

24     process.  They weren't aware of that process.  The State

25     acted the way the State acted based upon the information

1       that was before them.

2                When you look back at the City of Memphis and

3       you look back at Startzell, that kind of information

4       existed.  It doesn't exist here.  Why?  Because there's no

5       conspiracy, because as a citizen she simply brought

6       something to the State Police.

7                And then last, and I'll conclude, let's not lose

8       sight, she has a First Amendment right to be heard.  And

9       that First Amendment right to be heard, judge, in the cases

10      I cite, allow her to step one step forward to the State

11      Police and say, "My First Amendment right is going to be

12      trampled upon.  What can we do?"  And the State then takes

13      the action that they feel is appropriate.  She didn't do

14      it.  She didn't tell them, "Erect a barrier."  She didn't

15      tell them where to put the place.  At least there's no

16      allegations in this, and they're constrained by their

17      allegations, judge.  And if they didn't have it, a

18      complaint's not supposed to be filed.

19               And that's the argument that I make.  So first

20      it's no state action at all, but second of all, you have to

21      look at state action with the overlay, your Honor, of the

22      First Amendment rights that grievant had and MACIL had in

23      putting on this program.  And that's the background as to

24      how this came about.

25               THE COURT:  Okay, thank you.

1           MR. MEIHN:  Thanks, judge.

2           THE COURT:  Ms. Porter, final words, ma'am.

3           MS. PORTER:  Thank you, your Honor.

4           Your Honor, I'm not going to dwell on the

5    freedom bus because it's really not relevant to the outcome

6    of your decision on the issues that you're questioning us

7    about, but it is disputed that the plaintiffs came off that

8    bus.  They did not, for whatever that's worth.  More to the

9    point, Mr. Schramm takes plaintiffs to task for not taking

10    discovery about some of the issues that we now claim we

11    need discovery on.

12           As I laid out in my affidavit as an officer of

13    this court I had a belief.  If I'm wrong, I am okay being

14    told that, that with the filing of dispositive motions that

15    it was not an appropriate time to commence a Rule 26(f)

16    conference or to seek this Court's blessing of the

17    scheduling order.  In fact, once I received the reply brief

18    from HAII in this matter, I reached out to counsel, told

19    them I was surprised at their position that since they were

20    amenable to conducting discovery, let's get going, and I

21    sought to schedule a Rule 26(f) conference with HAAI.

22    There has been objection from the other defendants in

23    communication with your Honor's case manager who apparently

24    advised that plaintiff's counsel, me, was correct, that we

25    should not be commencing discovery until resolution of the

1       motions here.  So if I was wrong and dilatory in not

2       seeking to depose Ms. Weaver or take other discovery while

3       these motions were pending, that is my mistake and I'm

4       sorry for that.  I ask that it not be --

5               THE COURT:  But what do you think you could

6       find?

7               MS. PORTER:  Well, what --

8               THE COURT:  You really don't know what you can

9       find.

10              MS. PORTER:  Well, your Honor, one of -- one of

11      the key issues they are arguing is that Ellen Weaver is

12      not -- is not responsible for the acts of HAAI.  They point

13      to her not being in the --

14             THE COURT:  Or HAAI is not bound by Ellen

15      Weaver's acts --

16             MS. PORTER:  Yes, your Honor.

17             THE COURT:  -- is a good way to say that, I

18      think.

19             MS. PORTER:  Yes, your Honor.  And --

20             THE COURT:  I almost always called her Elizabeth

21      Weaver, but we all know --

22             MS. PORTER:  Yes.  Yes, that's correct.  And --

23      and we did supply, as an exhibit to the affidavit that I

24      submitted to this Court what we believe constitutes

25      evidence that she was holding herself out as a

1         representative of that organization at the time and --

2                    THE COURT:  The address you're talking about?

3                    MS. PORTER:  That's part of it.  Also -- that is

4         part of it.  It is possible -- your Honor, we could be

5         wrong.  It is possible that the Michigan State Police were

6         entirely incorrect in associating her not just in that line

7         but all throughout the report with the actions of that

8         organization.  The permit was issued, my understanding is

9         the permit was issued to the organization in her name at

10        the business address.  There were multiple other instances

11        throughout the report tying her to the organization.  That,

12        and, you know, no, I did not have my client submit an

13        affidavit about his understanding of her role, because that

14        was no different than the information that I was already

15        providing in connection with the report.

16                   Beyond that though, your Honor, the complaint,

17        and I'm looking here at the paragraphs on pages 10 and 11

18        where we describe what we --

19                   THE COURT:  Just a minute.  I'll be right with

20        you here.  Pages 10 and 11?

21                   MS. PORTER:  Yes, your Honor.

22                   THE COURT:  Okay, I've got it.

23                   MS. PORTER:  Up at the top, it goes to the prior

24        page, page 9, paragraph 40, you know, through page 10 and

25        onto page 11.  In those paragraphs we describe what we

1    understand, based only off of the middle prefiling

2    investigation that we were able to do, we describe what we

3    believe happened.  But let me take paragraph 46 as an

4    example.  Even though, and this is describing a meeting

5    among a representative of the Michigan State Police,

6    Sergeant Jeff Held, and then on the other hand Sara

7    Grivetti and Ellen Weaver.

8         Even though there was no basis whatsoever to

9    conclude that plaintiffs or their colleagues were violent

10   or any threat to public safety at all, defendant Sergeant

11   Jeff Held agreed with Sara Grivetti and Ellen Weaver that

12   Sergeant Held would cause the Michigan State Police to

13   exclude anyone that they believed were protestors from the

14   ADA event.  Sergeant Held to Grivetti and Weaver that the

15   Michigan State Police would not permit protestors to pass

16   beyond the Austin Blair statue.  What do I think I'm going

17   to get in discovery?  I want to know about that discussion.

18   Who decided on the Austin Blair statue?  Did Ms. Weaver or

19   Ms. Grivetti have input into that decision?  Did they

20   suggest that that would be far enough away not to bother

21   them or constitute a disruption?  Was there a discussion

22   about how loud the amplification system would be?  Was

23   there discussion -- I don't know these things.  And it is

24   not, I'm very familiar with the requirements of Iqbal and

25   Twombly.  I would be very surprised if anyone would

1       characterize this complaint as a bare bones recitation of

2       just the elements of the causes of action.  We took a lot

3       of care to explain what we knew about the facts and what we

4       allege happened.  But there are bound to be some holes when

5       only the defendants possess information that the plaintiffs

6       did not have access to and don't know.  And so if we are

7       permitted to take discovery from the organizational

8       defendants in this action, your Honor, we intend to explore

9       more fully the facts that support the conspiracy theory

10      that we're alleging.

11              I do certainly have a lot to say about the first

12      amendment issues, but I don't understand the Court to be

13      asking me about that right now.

14              THE COURT:  Not yet.  Not yet.

15              MS. PORTER:  I will keep my powder dry though.

16              THE COURT:  Okay.

17              MS. PORTER:  Thank you, your Honor.

18              THE COURT:  Your powder, oh.

19              Okay, let's go on then to the next issue that we

20      have.  Mr. Harcz, is that how you pronounce his name,

21      H-a-r-c-z?

22              MS. PORTER:  Yes.

23              THE COURT:  Harcz?  Individual claims, malicious

24      prosecution and false arrest under federal and state law.

25      Let me tell you, I've looked at the videos that you had,

1    but not all of them.  I did look at the incident.  That's

2    because I couldn't figure out quite how to work the

3    computer, but of course the law clerk showed me and I did

4    look at some of them.  But I did look more than once at the

5    video showing the incident of the arrest, although it's not

6    really clear, exactly clear as to what happened there.

7             Nonetheless, there was a hearing in front of the

8    district court in Ingham County that found probable cause.

9    Why are not I -- why am I not bound by the finding of

10   probable cause in the criminal case that was at that

11   particular time being prosecuted in Ingham County?  I know

12   that they didn't go forward with a trial on it, but and

13   they dismissed the charge, but they did find probable

14   cause.  Yup, go ahead.

15            MS. PORTER:  There's a couple reasons, judge.

16   There's at least two ways of looking at this.  One is that

17   we specifically allege in the complaint that the judge

18   heard false and misleading testimony from a Michigan State

19   police officer at the hearing, and that, combined with the

20   prosecution's presentation, which was also based on false

21   and misleading evidence from police officers, including

22   false police reports, tainted the probable cause decision.

23            We allege that specifically, and also I do not

24   believe our allegations are summary in nature.  We cite

25   specific excerpts from the police reports, we cite specific

—24—

1          excerpts from the preliminary examination testimony, and we

2          also specific --

3                    THE COURT:  Did Mr. Harcz have a lawyer at that

4          hearing?

5                    MS. PORTER:  Yes, your Honor, he did.  Uh-huh.

6                    THE COURT:  Was it you, by the way?

7                    MS. PORTER:  No.

8                    THE COURT:  Okay.  Wouldn't all of this stuff

9          have been brought out by a lawyer on behalf of Mr. Harcz?

10                   MS. PORTER:  It is not fair for me to comment on

11         the effectiveness of Mr. Harcz's counsel, your Honor.  But

12         let me -- I think my second argument may be relevant to

13         what your question is, so --

14                   THE COURT:  Go ahead then.

15                   MS. PORTER:  If I might.

16                   THE COURT:  Go ahead.

17                   MS. PORTER:  To close off the first argument, we

18         allege that these false and misleading input into the

19         probable cause determination tainted the output, and under

20         the caselaw, that is a basis for sustaining our charges at

21         a motion to dismiss stage.

22                   The second possibility, and I raise this because

23         defendants have attached the entire preliminary examination

24         transcript to their pleadings, and the Court can read it as

25         a whole.  If the Court reads that transcript and you find

1        that the state court judge made a determination that Joe's

2        simple refusal to comply with the police order not to enter

3        the event --

4                THE COURT:  Is that Mr. Harcz?

5                MS. PORTER:  Mr. Harcz.  I'm sorry.

6                THE COURT:  Refer to him by his last name, yeah.

7                MS. PORTER:  Yes, I'm sorry.  That Mr. Harcz's

8        simple refusal not to accede to the police officers'

9        commands that he not go into the event, that that was a

10       sufficient basis to bind these charges over for probable

11       cause.  You can conclude two things from that.  The first

12       is that the state judge was wrong.  If that's what he held,

13       that just not obeying the police was enough to cause Joe --

14       Mr. Harcz to be charged with that crime and for that to be

15       probable cause, that is incorrect.

16                And the second thing that your Honor can

17       conclude is that you need not be bound by that.  Because

18       this case raises issues of Mr. Harcz's federal

19       constitutional claims, and if the issue is whether the

20       police gave a lawful command to him under the First

21       Amendment of the U.S. Constitution, and whether he was

22       obliged to comply with that, you are the arbiter of the

23       federal criminal -- the federal constitutional law.  It is

24       your responsibility and your right to make that

25       determination on your own.  So if you read that transcript

1    and you conclude that was the basis of the state court

2    judge's probable cause determination, A, it's incorrect,

3    and B, you are not bound by it.

4                I do -- you mentioned the videos, your Honor,

5    and I do want to point a few things out about that.  The

6    impression I think that defendants seek to convey about

7    those videos is that everything you need to know about the

8    arrest is on those tapes.  The plaintiff, Mr. Harcz in

9    particular, because that part is more about him, does not

10   agree.

11               The video tapes that were submitted to you are

12   excerpts from body cameras worn by just a few of the police

13   officers who are on the scene.  Are there more body cameras

14   that have not been provided?  We don't know that.  I have

15   not seen any more than what the Court has seen, but even

16   those recordings begin only at 11 a.m. on the day of the

17   ADA event.  They show absolutely nothing preceding the

18   event.  And even just as to the event of Mr. Harcz's

19   arrest, they show angles that are dependent on where the

20   officer wearing the body cam was standing.  They do not

21   show a full-on view.

22               I do have an excerpt from a news video which I

23   have showed to defense counsel and that I'm happy to show

24   to the Court.  It is very, very short.  But it is a view

25   from the back of what's happening.  And what you can see

1        on --

2                      THE COURT:  The back of what?

3                      MS. PORTER:  I'm sorry, it's --

4                      THE COURT:  Or whom?

5                      MS. PORTER:  It's behind Mr. Harcz and the

6        police.

7                      THE COURT:  Okay.

8                      MS. PORTER:  So it's --

9                      THE COURT:  All right.

10                     MS. PORTER:  -- straight-on facing him.  And

11       what can plainly be seen on the video is not Mr. Harcz

12       pushing anyone, not Mr. Harcz shoving anyone, not Mr. Harcz

13       hitting anyone with his white cane for the blind, but

14       instead the police officer yanking Mr. Harcz across the

15       barrier and his stick going flying and accidentally hitting

16       one of the officers who is standing there.

17                     My point, of course that's not before your

18       Honor, it's not attached in any way to our pleading or to

19       anyone's pleadings.  My point is that relying on these

20       certain angles of video tapes for a proposition that this

21       tells everything we need to know, and so of course probable

22       cause is undisputed, is incorrect.  It is disputed.  We

23       dispute the account that the defendants put forward about

24       what happened.

25                     In particular, your Honor, we deeply dispute the

1      notion that Joe Harcz wanted to get arrested.  It's

2      offensive.  He did not set out that day to get arrested.

3      He is a man in his sixties who is blind, as we allege in

4      the complaint, who has been advocating for people with

5      disabilities for much of his life.  He came at great

6      difficulty to that event.  He was on the planning

7      committee.  He was wearing, as your Honor saw in the video,

8      a 25th anniversary ADA celebration t-shirt.

9              Was he upset when they stopped him on the

10     sidewalk and told him that he wasn't going to be allowed

11     in?  Yes, he was upset about that.  And he stood there and

12     he said, "You cannot violate my civil rights."  And as your

13     Honor knows from the caselaw, the way most of these cases

14     end is the police stop someone at an event and threaten

15     them with arrest and they go away, and then they get a

16     lawyer and they file a declaratory judgment action, and the

17     court deals with the constitutionality of what has

18     happened.

19             Mr. Harcz did not do that.  He knew that they

20     were wrong at the time, and what I think was quite

21     courageous, especially because he could not see them, he

22     had a line of officers who would not speak to him or answer

23     his questions standing in front of him shifting their

24     bodies as he was trying to do what he believed he was

25     lawfully able to do, which is just enter the event, and

1    said, "You can't do this to me.  And by the way, my friends

2    behind me, I hope you're filming this, because if they

3    arrest me, that's against the law and I want someone

4    sometime to be able to see what happened."

5         And so this notion that he was trying to get

6    arrested and that probable cause is a foregone conclusion

7    and the judge found and that's all tied up, we do dispute

8    that greatly.  And I do think your Honor is very free to

9    make your own determination if the question is whether just

10   complying with what the police said to do is enough to hold

11   him over.

12        Beyond that though we specifically allege false

13   and misleading testimony and that is also enough under the

14   law.

15        THE COURT:  All right, thank you.

16        MS. PORTER:  Thank you, your Honor.

17        THE COURT:  Mr. Fedynsky, you're the one that's

18   up now, I think.

19        MR. FEDYNSKY:  Thank you, your Honor.  It's

20   simply insufficient as a matter of law to allege false and

21   misleading testimony when you have the actual preliminary

22   exam transcript before you and the videos.  They have

23   offered two bodies of proof that they claim are false and

24   misleading, testimony at the preliminary exam and police

25   reports.  The police reports are a dead letter.  They were

1     not entered into evidence.  They were not relied upon by

2     any of the state court judges.  The testimony the Court can

3     read for itself and compare to the video that's before the

4     Court, and there is no reasonable basis to find any of that

5     testimony misleading, your Honor.

6            And as a matter of law, based upon caselaw

7     that's already out there, if you have a false arrest claim,

8     a malicious prosecution claim where absence of probable

9     cause is a keystone element, yet you've been bound over in

10    state court, you do not get to challenge that unless you

11    meet that very narrow exception that something false and

12    misleading was presented.  And the cases where that's

13    actually been found is where a video is found afterwards

14    and a police officer is caught in a lie, or where there's

15    forensic testing and only two hairs were tested and not the

16    other three or four hairs.  There is nothing of that degree

17    or kind in terms of misconduct here.  And so this Court, as

18    a matter of issue preclusion, cannot revisit the probable

19    cause determination.  Plaintiff is bound by that.  It was

20    decided with finality in the state court proceeding.

21           And even if this Court isn't inclined to believe

22    that, upon de novo review, there is absolutely enough here

23    for a reasonable officer to conclude that there's probable

24    cause to arrest that individual.  It's plain in the video,

25    it's plain in the admissions that Mr. Harcz makes on that

1    video about "I don't care about this barrier, I'm busting

2    through it."  That is all there for a Court to hear and for

3    the Court to see.  And it is a plainly lawful order to say

4    "stand behind this line."

5              Time, place, and manner restrictions, your

6    Honor, and I don't want to get too deep into the First

7    Amendment analysis, but inherent in the idea of a time,

8    place, manner restriction is police discretion to designate

9    within constitutional bounds where that place is.  That's

10   what happened here.  They cannot get past the probable

11   cause issue on any of these Fourth Amendment claims.  And

12   for that reason those need to be dismissed with prejudice

13   as a matter of law.  No discovery is going to change any of

14   that either, your Honor.  There's nothing that can be

15   discovered about what happened at the moment of that

16   arrest, because that is the moment in time for the Fourth

17   Amendment claim that matters, and the moment in time that

18   matters for malicious prosecution is what did police know

19   at the time, why was he arrested, and where did these

20   charges come from.

21              THE COURT:  It is very, like I said, very hard

22   for me to understand what I was seeing and what I was

23   hearing on that video.  Do you have any problem with me

24   looking at plaintiff's video?

25              MR. FEDYNSKY:  No, your Honor.

1              THE COURT:  Okay.

2              MR. FEDYNSKY:  I would just ask that the record

3       later on, supplemented copies be sent to all counsel and

4       that it be made part of the court file.

5              THE COURT:  I'm sure she'll do that.

6              MS. PORTER:  Your Honor, may I --

7              THE COURT:  Yeah, please, final words on this

8       issue, Ms. Porter.  Come on.

9              MS. PORTER:  I was just going to hand the

10      computer to your law clerk, but let me talk again.

11             THE COURT:  I've started with Apple 2's fifty

12      years ago, so.

13             MS. PORTER:  Yes.  Your Honor, I think most of

14      this is addressed in our briefing and I know you've read

15      it.  In response to counsel's presentation, I point out

16      that we have two sets of claims for Mr. Harcz.  There's a

17      federal and state false arrest claim, and there is a

18      federal and state malicious prosecution claim.  I point

19      that out in response to the notion that the false police

20      reports are a dead letter.  They're not, your Honor.  The

21      police arrested Mr. Harcz and wrote false reports, and

22      based on those, detained him at the capitol building for a

23      long time, and then submitted him for prosecution.  The

24      false police reports are highly relevant to that.

25                  They're also relevant to the prosecution because

1      when, as I understand the malicious prosecution caselaw,

2      typically officers or somebody else are not going to be

3      held responsible for that unless it can be shown that they

4      overtook a prosecutor's independent discretion by, for

5      example, providing such false and misleading information

6      that the prosecutor is going forward on something that she

7      believes to be true that isn't.

8              Here the police wrote reports saying that

9      Mr. Harcz assaulted the officers, that he pushed them, that

10     he used his cane to strike at them.  That is not true.  It

11     is completely false.  The only thing that Mr. Harcz did,

12     which he does admit doing, is that he refused to comply

13     with what he believed to be an unlawful police order, which

14     he by law is permitted to do.

15             And so no, it is not accurate to say that, you

16     know, so counsel says the video shows "I don't care about

17     this barrier, I'm going through."  That is not sufficient

18     to state probable cause.  That is Mr. Harcz believing that

19     the order that he's being given to remain behind the

20     barrier is unlawful, that the police are acting unlawfully.

21     Not only is he allowed to ignore that and go forward

22     anyway, he's even allowed under the case law to use force.

23     He didn't use force, but he could have.

24             With that, your Honor, may I hand the laptop to

25     your clerk?

1          THE COURT:  No.  I won't look at it now.  I'll

2      look at it later.

3          MS. PORTER:  Oh, okay.  I'll submit it.

4          THE COURT:  Right.

5          MS. PORTER:  I'll submit it.  Thank you, your

6      Honor.

7          THE COURT:  Okay, thank you.

8          Okay, Mr. Fedynsky.  I have some real problems

9      with your argument, I have to say, and that is I've read a

10     number of cases now, one of which was decided after all of

11     this, and that's the second Bible Believers case, which I

12     thought was pretty much a pretty good tour de force of the

13     law in this area, although it was decided about a year

14     after we had, or this particular incident occurred.

15         And frankly, I was a bit surprised by how broad

16     the First Amendment is in these confrontational type

17     situations.  But I also came to the conclusion, tentative

18     conclusion subject to what you say and any further research

19     that I do, that a person, even if you have a licensed

20     organized group on public property, people that are

21     protesting are entitled to entrance, pretty much as the

22     plaintiff says, absent any kind of real threat or -- and by

23     real threat I mean imminent threat or something like that.

24         Now you might disagree with the law and I might

25     disagree with the law because it's harder to get rid of

1          someone than to prevent someone from getting there, but

2          here there's no evidence, other than your allegation that

3          one of the plaintiffs, Mr. Harcz, tried to get through the

4          police line, that there was going to be any kind of

5          confrontation in there.  They were going to be passing out

6          literature, holding signs up, and that type of thing which

7          would not, and they said repeatedly that they were not

8          going to interfere with the meeting.  So why keep them out

9          in a public location, in a public forum?

10                   MR. FEDYNSKY:  Well, I think on this record they

11         weren't kept out.  A barrier was erected, your Honor, but

12         they were on the capitol grounds, they were right next to

13         where other --

14                   THE COURT:  Yeah, there was a separation between

15         them.

16                   MR. FEDYNSKY:  Absolutely.  And I think it's

17         important the Court points out Bible Believers time of

18         decision because to have a case that overcomes qualified

19         immunity, it has to be clearly established under the law.

20         You can't hold police under a standard that was decided

21         after something happened.  But even if you look at the

22         Bible Believers' case, your Honor, it's footnote one in my

23         reply brief, record number 43, page 4.  According to the

24         en banc court in the Sixth Circuit, quote, "There were a

25         number of easily identifiable measures that could have been

1    taken short of removing the speaker, such as erecting a

2    barrier for free speech."  No speaker was removed from the

3    capitol grounds in this case, your Honor.  And in many

4    respects, that is the beginning and the end of the Court's

5    analysis.  The cases where declaratory judgment is

6    appropriate where First Amendment rights are vindicated by

7    federal courts is where there was an arrest for trespass or

8    an arrest for refusing to disperse or an arrest for not

9    having a permit.  There has to be some kind of ejection or

10   squelching or significant burdening of First Amendment

11   speech.

12         Here you have a reasonable time, place, and

13   manner restriction.  And under the case law, the courts say

14   there are very important interests that those things can

15   serve.  They can be content neutral and nondiscriminatory,

16   and the government is flexible in terms of how it's

17   deployed.  There's no dispute here this was a public forum,

18   it's the capitol grounds.  But on the other hand, as

19   co-counsel has stated, there are other First Amendment

20   rights at stake, too.  The people who have a scheduled

21   permitted event, and then the folks who want to come and

22   protest and hand out their literature.  No one was

23   prevented from handing out literature.  They were simply

24   prevented from approaching the microphone.

25         Under clearly established caselaw, drawing a

1      line that says "this is the time, place, and manner for

2      what each group wants to do" is perfectly reasonable, and I

3      think the Court pointed out the context in the nation these

4      days what's going on with barriers being put up and

5      discordant groups being kept apart. The police have a hard

6      enough job trying to keep the peace as it is, and to

7      second-guess or to question putting up this barrier, which

8      by the way wasn't put up in advance. It was brought after

9      a line of officers was used initially. That's all in the

10     preliminary examination transcript. But putting up a

11     couple of aluminum barriers and keeping a group away, but

12     within earshot and able to still attend the event, doesn't

13     meet any fact patterns like Bible Believers or like the

14     other cases cited by plaintiff where a First Amendment

15     claim was found to be viable.

16          And based upon what's before the Court, your

17     Honor, the capitol security team here had a narrow path to

18     hew, but I think they did it all within Constitutional

19     limitations. And I believe it's also apparent in the

20     video, I'm not sure if it's alleged in the complaint, that

21     the group that came there to protest also had a bullhorn.

22     So again, these are all developing facts, it's very similar

23     to the kind of Fourth Amendment reasonable arrest analysis,

24     but when officers are responding to scenes like this, you

25     don't want a fuse to get lit, you don't want public safety

1      to be threatened, and you want, even if they are discordant

2      groups, to be able to exercise their rights without

3      deploying a Heckler's Veto to stop another group's rights.

4           So I think under the caselaw, your Honor, it's

5      not as problematic as the Court introduced the issue.

6      Really, these two groups were permitted to coexist within

7      reasonable proximity, and the question here is, is it

8      beyond the pale of all reasonable outcomes for a police

9      officer to draw the line that was drawn here?  Was it

10     plainly incompetent or a knowing violation of the law to

11     draw that line at the Austin Blair statue?  And there's not

12     one case out there that says, yes, that's plainly against

13     the law, or you had to have been incompetent to do that.

14          Any fair viewing of the evidence in this case

15     that's fairly before the Court is that the police did an

16     admirable job.  You might question the wisdom of it, you

17     might question what other methods could have been deployed,

18     but again, your Honor, the caselaw says the government has

19     some flexibility when it comes to these sorts of time,

20     place, and manner restrictions.

21          THE COURT:  Well, I typed up a bunch of notes,

22     and any time, place, and manner restriction must be content

23     neutral, narrowly tailored to serve a significant

24     government interest, and leave open ample alternative

25     channels for the party to communicate.  An alternative is

1    not ample if the speaker is not permitted to reach the

2    intended audience, Saieg against City of Dearborn, 641 F.3d

3    727, (6th Circuit 2011.)

4              That's the problem.

5              MR. FEDYNSKY:  Well, the thing about Saieg, your

6    Honor, that case is the restriction that was struck down is

7    that leafletting was only permitted at a festival at a

8    stationary booth.

9              THE COURT:  At a stationary booth, right.

10             MR. FEDYNSKY:  And not by walking around.  There

11   was no -- nothing analogous here happened, your Honor.  A

12   protest was able to occur, the booing, the heckling, the

13   chanting, the speech, the handing of leafletting still

14   could happen, they just couldn't do it at the foot of the

15   stage.

16             THE COURT:  Yeah.  But you say "could happen."

17             MR. FEDYNSKY:  No one was ejected from --

18             THE COURT:  And I agree that it's harder to

19   eject someone than to prevent them --

20             MR. FEDYNSKY:  Sure.

21             THE COURT:  -- from doing something.  On the

22   other hand, how do you know that they were going to be

23   booing, heckling, etcetera, etcetera?

24             MR. FEDYNSKY:  Sure.

25             THE COURT:  The chanting I heard was, "Let us

1          in.  Let us in."  That's what they were protesting outside.

2          They weren't allowed in.

3                    MR. FEDYNSKY:  And if you watch the video,

4          particularly when Mr. Harcz is arrested, the other

5          spectators are right there next to them.  They were in the

6          event.  They were simply kept behind a barrier, but they

7          were in the event, your Honor.

8                    THE COURT:  Come on, Mr. Fedynsky, they were too

9          far away, unless you had some special lens on the cameras

10         that I couldn't recognize.

11                   MR. FEDYNSKY:  Well, your Honor --

12                   THE COURT:  How many feet do you think they were

13         apart?

14                   MR. FEDYNSKY:  Apart from where?  You've got to

15         set the goalposts.

16                   THE COURT:  Where the crowd was.

17                   MR. FEDYNSKY:  Sure.  Well, the complaint, and

18         we'll accept what the complaint alleges there --

19                   THE COURT:  As I see it, what -- were there

20         speakers and things like that up there and because there's,

21         from what I saw, there's a substantial, and I know you have

22         telephoto lens and wide angle lens, so it's hard to tell.

23         But it seems to me to be a substantial difference between

24         where the plaintiffs and their supporters where and where

25         the other people attending the meeting were.  In other

1          words, those that were, you might say approved by the

2          sponsors.

3                    MR. FEDYNSKY:  I think that's incorrect, your

4          Honor.  If you look at those videos, particularly when

5          Mr. Harcz is led away.  Let's set the context factually.

6          Plaintiff alleges in their complaint variously that the

7          barrier was 130 to 150 feet from the stage.  In that 130 to

8          150 feet, there are multiple rows of chairs, there's an

9          audience, there's people that populate that area, and then

10         there's people off to the side and on the grass.  The

11         Austin Blair statue is sort of up on a curb with grass

12         around it, if I'm not mistaken, and there's plants and

13         things of that sort.  But if you watch where the edge of

14         that crowd is in relation to where that barrier was placed,

15         my best estimate is that's 10 to 20 feet away.  They were

16         right next to other people who were in wheelchairs, other

17         people who were in plastic chairs, other people who were at

18         that event listening, participating, engaging.

19                    And being placed in that location does not

20         violate any clearly established law, your Honor.  Because

21         had they been placed closer, and again this is a police

22         decision, not a judicial decision to be second-guessed, but

23         in terms of line drawing, the Court's question isn't, well,

24         where would it have been better, the question is at what

25         point does it violate the Constitution.

1           I think they might have caselaw that says if

2      they said, "Go across Capitol Street, you can't cross

3      Capitol Street, park a bus in front of them, do whatever,"

4      that might violate the Constitution.  But where they're at

5      at the foot of the Austin Blair statue, in the thick of it

6      all, not that far from other participants, other people,

7      within earshot, within view of everything, they were not

8      ejected.  They were not excluded.  It's a visible fiction

9      in their complaint that they say they were excluded.  And

10     the Scott case, which is a Fourth Amendment case involving

11     a fatal police chase, the Supreme Court said --

12           THE COURT:  Yeah.

13           MR. FEDYNSKY:  -- it is legal error to accept a

14     visible fiction or a legal conclusion when objective

15     evidence tells another story.  And the evidence that's

16     before this Court, which is properly before this Court,

17     which no discovery's going to change because it's apparent

18     where they were in relation to other participants.  And

19     it's nothing like the City of Dearborn case or the Bible

20     Believers case.

21           And at the very least, your Honor, you say that

22     under the clearly established prong of qualified immunity,

23     there's no First Amendment claim here.  It has to be

24     plainly violative of the Constitution or something that's

25     so plainly incompetent that these police did that they had

1      to have known they were violating the law.

2                  THE COURT:  Okay, thank you.

3                  MR. FEDYNSKY:  Thank you, judge.

4                  MS. PORTER:  Not only was it plainly

5      incompetent, it was outrageous.  And that description of

6      the law does not match the law at all.  This is not just

7      Bible Believe -- I agree with the Court that Bible

8      Believers was a tour de force in summarizing what has been

9      the law for many, many years.

10                  And I will start with 80 years ago the Supreme

11     Court in Schneider versus State of New Jersey, one is not

12     to have the exercise of his liberty of expression in

13     appropriate places abridged on the plea that it may be

14     exercised in some other place.

15                  The notion that they were still technically on

16     capitol grounds does not in any way, shape, or form allow

17     the police to keep my clients behind a barrier and prevent

18     them from entering the event.  It doesn't matter if they

19     are, you know, ten feet from the person sitting in the last

20     chair in the last row.  That is not acceptable.  This was

21     an event with booths, with food, with music, with water,

22     opportunity to mingle around the crowds.  What my clients

23     wanted to do was attend, speak with people, hand out their

24     leaflets, hand out their stickers.

25                  Nobody used a bullhorn.  One of my clients,

1      Ms. Canter, possessed a bullhorn.  The police told her,

2      "Don't you dare turn that thing on or we'll take it away

3      from you."  She said, "Fine."  There was no use of

4      bullhorns, they were not doing that.

5           The Sixth Circuit has addressed this issue very

6      directly in cases that are just like ours, just like this,

7      your Honor.  Parks versus Finan in 2004.  A man wanted to

8      carry a sign and hand out leaflets at a rally at the state

9      capitol square.  He was not ejected from the grounds.  He

10     wasn't hauled away from the grounds.  The police there told

11     him that he had to stay on a sidewalk just outside the

12     rally.  That was a violation of the First Amendment.

13          Parks versus City of Columbus in 2005.  There

14     the plaintiff had a sign and he wanted to distribute

15     religious literature at an event that was free and open to

16     the public.  Just like this.  He wasn't ejected from the

17     grounds, he was not hauled away.  The police told him to

18     stay behind a barricaded area and they threatened to arrest

19     him if he didn't comply.  That was a violation of the First

20     Amendment.

21          These cases stand for the proposition that just

22     like the Supreme Court said in Schneider and repeated again

23     in United States versus Grace in 1983, being restricted

24     behind a barrier or being limited to a sidewalk, that is

25     not okay.  That is not sufficient to satisfy the First

1    Amendment.  It wasn't okay to keep my clients behind a

2    barricade.  It wasn't okay to put them behind a line of a

3    police.  It was not okay not to let them in.  And it just

4    does not matter that they were still standing on the

5    capitol grounds at the time that they were restricted.

6            The other part of this is as in the cases that I

7    just cited, there was no compelling state interest to do

8    this to my clients.  And the defendants do not address this

9    in their reply briefs, they haven't addressed it today.

10   You know, they say things, and this is in the brief,

11   plaintiffs were within earshot of the ADA event.  They were

12   within sight of stage.

13           In these cases like Saieg versus City of

14   Dearborn that your Honor mentioned, and Bays versus City of

15   Fairborn, the distinction that they're trying to make,

16   well, in those cases there was a permitting scheme and the

17   plaintiffs were limited to a booth.  What I think

18   defendants fail to grasp, your Honor, is that those cases

19   are actually better for the government than this one.  At

20   least in those cases the police have something to hang

21   their hat on.  They said, "Oh, well, we had this rule.

22   There was a permit by the city that anybody who wanted to

23   hand out leaflets has to be restricted to a booth, and so

24   we were just trying to enforce that."  And those were, the

25   Sixth Circuit found in both of those cases, those were

1    content-neutral provisions, it's true, you know, it doesn't

2    matter what the leaflets say if you're -- you just have to

3    be behind the booth.

4           Here they had nothing like that.  There was no

5    capitol rule, there was no permit permitting scheme, there

6    was no legislative structure that the police were

7    enforcing.  They were keeping my clients out because they

8    didn't want my clients' message which conflicted, they

9    believed, with the message of the organizers of the event

10   to disrupt what they were doing.  They didn't like the

11   message.  It was a content-based restriction.

12          So our situation here is much worse for the

13   state, much worse for the defendants than the Saieg versus

14   City of Dearborn and Bays versus City of Fairborn.

15          But I also want to point out that in both of

16   those cases the Sixth Circuit said no, these were

17   situations where plaintiffs had signs and leaflets, they

18   wanted to go into a place that was free and open to the

19   public, the police said no, you can't come in.  The Sixth

20   Circuit said no, that is unconstitutional.

21          The defendants here have also not provided the

22   Court with any response at all that I can tell to the fact

23   that there is not a compelling state interest or even a

24   significant government interest here.  Mr. Fedynsky says

25   the police did an admirable job and that, you know, I

1          think -- I think the notion was when officers are

2          responding to something like this, they don't want

3          someone's fuse to get lit.

4               Your Honor, these general appeals to crowd

5          control or to public safety, the courts have considered

6          those arguments again and again, and they do not fly.  They

7          are insufficient.  The compelling or significant government

8          interest must be a real harm.  It cannot just be

9          conjectural.  And in this case there was no real harm.

10               And one thing the defendants do not mention in

11          their briefs, they do not mention today, your Honor touched

12          upon it, is that this did not start when the plaintiffs got

13          upset, when they were yelling, "Let me in."  This started

14          days before when they made a concerted decision not to

15          allow my clients to enter the event.  They hadn't done

16          anything.  That day my clients, most of whom are blind and

17          therefore would have no other way to find one another

18          unless they set a meeting place, picked a spot, you know,

19          corner nearby the capitol, to gather.  One had a sign that

20          said "National Federation For the Blind."  Some of the

21          others had other signs, you know, having to do with some of

22          the issues about the ADA that they objected to.  They were

23          just standing there when a sergeant from the Michigan State

24          Police comes up to them, and this is alleged in the

25          complaint, "Are you planning to enter the event today?"

1       "Oh yes.  Yes, we are."  "Well, you can't go in."

2               And the police did the same thing to Mr. Harcz

3       and Ms. Canter and Ms. Dean when they approached from a

4       different angle, just seeing them holding leaflets and

5       holding signs, that was what caused the police to tell them

6       they could not enter.  Those -- there is no compelling

7       state interest, there's no legitimate government interest

8       in keeping them out.

9               The danger, and, you know, again, this isn't

10      what is addressed, had to do with the content of their

11      message.

12              The last issue I'll address on this with respect

13      to qualified immunity, the Bible Believers case did come

14      out in 2015, I don't remember the month.  But this event

15      was in --

16              THE COURT:  October.

17              MS. PORTER:  Thank you, your Honor.  So that was

18      after.  But this line of cases that produced Bible

19      Believers is a very long line of cases going decades, going

20      back decades, not only from the U.S. Supreme Court, but

21      within this circuit as well.  If the police want to tell

22      this Court that they had no idea that this was the law,

23      that is on them, your Honor.  That is unreasonable.  The

24      standard for qualified immunity was were the rights at

25      issue clearly established at the time of the alleged

1         misconduct.  That is the standard for qualified immunity.

2              These rights absolutely were clearly established

3         and the fact patterns in the cases that we've cited and

4         that I've discussed with you this afternoon mirror what

5         happened here exactly.  The fact pattern is exactly the

6         same and the outcome is exactly the same.  There is not

7         something different that happened here.  The only thing

8         different is that this is worse.  Thank you, your Honor.

9              THE COURT:  All right, thank you.  Have I hit

10        all the issues?

11             MR. FEDYNSKY:  Your Honor.

12             THE COURT:  What did I miss, Mr. Fedynsky?

13             MR. FEDYNSKY:  Well, we did brief what the state

14        interests at stake are, and those are recognized by courts

15        Hill v Colorado, a U.S. Supreme Court decision cited on

16        page six of our reply brief.  Parks v Finan.  Again, the

17        state has a substantial interest in providing the permitted

18        speakers are able to engage effectively in expressive

19        activities.  And as far as the qualified immunity analysis

20        goes, your Honor, lots of these cases are decided in the

21        Sixth Circuit two to one, or in the en banc scenario.  If

22        you read Bible Believers, that one was eight to six, I

23        think.  And if you read the dissent, it's pretty

24        compelling.

25             THE COURT:  Yup, but we're all bound by the

—50—

1       majority.

2                   MR. FEDYNSKY:  Oh, sure.  I understand, your

3       Honor, but where you have issues that are so fact

4       specific --

5                   THE COURT:  I see what you're saying is, but how

6       are the police supposed to know --

7                   MR. FEDYNSKY:  Exactly and what's --

8                   THE COURT:  -- if the judges can't agree?

9                   MR. FEDYNSKY:  -- what's clearly established

10      here, and can you really hold people at fault for that.

11      And lawyers can make a fine point about what exclusion is

12      and what ejection is, but there was no trespass citation

13      here, there was no ejection from the grounds, there was no

14      threat of arrest.  And if the answer is, well, this is

15      unlawful, then what time, place, and manner restriction

16      would be lawful in a similar situation where you have the

17      concerns of permitted speakers not wanting a Heckler's Veto

18      to disrupt their events, and frankly, your Honor, and

19      again, I haven't briefed this issue.  I don't think

20      plaintiff has either, but if you're conducting a permitted

21      event, people coming up and chanting, even people coming up

22      and silently distributing leaflets in the middle of a

23      ticketed event, walking through seating areas, imagine if

24      you're having a wedding or if you're having any kind of

25      public type of ceremony, that is disruptive.  And it's sort

1      of like the old line, your right to throw a punch ends

2      where my nose begins.  If someone's having speech and

3      someone else wants to have their discordant speech, what

4      are police supposed to do in terms of how they coexist, if

5      at all?  And if you are to erect --

6              THE COURT:  Here's the problem with that

7      argument.  You're talking about discordant speech and

8      disruption of meeting or rally that's going on on the state

9      capitol grounds without any evidence that I have seen that

10     that occurred or was threatened.

11             MR. FEDYNSKY:  Well, there's these meetings and

12     there's these allegations about the concerns of the

13     organizers who came to police, so if there wasn't any worry

14     about disruption, any worry about something being off, it

15     seems to me the police are simply responding to the

16     concerns that are provided.  And if you want --

17             THE COURT:  But think of how weak that argument

18     is.  Then anybody could exclude just about anybody else at

19     a public meeting, because "I'm concerned about it."  I mean

20     that's addressed pretty thoroughly in Bible Believers.  I

21     know that is later.

22             MR. FEDYNSKY:  Sure.

23             THE COURT:  But it, like Ms. Porter says, there

24     are a lot of cases that back up what they say, and a lot of

25     cases maybe on the other side, but --

1              MR. FEDYNSKY:  Sure.

2              THE COURT:  But the cases it cites are cases

3        that are decided.

4              MR. FEDYNSKY:  The problem with Bible Believers,

5        your Honor, was the order from the police saying, "Leave

6        this place or we will cite you or we will arrest you."

7        That was the problem, and there the issue is what do you do

8        when offensive speakers are surrounded by folks who are

9        throwing empty bottles and doing other things that, again,

10       is a challenge to public order and public safety.  Here we

11       have a very --

12             THE COURT:  Here are the -- that's the funny

13       thing about Bible Believers is as I read it, the people

14       that were upset about the Bible Believers were throwing the

15       things and causing the issue, and the police, instead of

16       going after them, the troublemakers, went after the Bible

17       Believers who were peaceful.

18             MR. FEDYNSKY:  But if you read the dissent,

19       there is a very different view of actually what was

20       happening and what was depicted.

21             THE COURT:  Is there?  Okay.

22             MR. FEDYNSKY:  And I think what we can agree on,

23       at least in terms of what's objectively before the Court,

24       is that no similar order of ejection, threat of trespass

25       citation, or any such thing happened.  What happened here

1    was a time, place, and manner restriction, and it was

2    content neutral.  If you read the preliminary exam

3    transcript, Sergeant Hernandez had no idea who was

4    protesting what or what the issue was.  The question was,

5    how can you have an orderly use of this public space when

6    you have one group that's oil and another group that's

7    water.  And what are the police supposed to do there, your

8    Honor.  Let them mix?  Is that the clear established law?

9              THE COURT:  You keep saying that.  You keep

10   saying that.  Now it's oil and water don't mix.  But I fail

11   to see any threat to anybody from someone walking around

12   and passing out bulletins, carrying a sign.

13             MR. FEDYNSKY:  Would you allow it in this

14   courtroom during a proceeding?

15             THE COURT:  No, because the freedom --

16             MR. FEDYNSKY:  That's a different issue.

17             THE COURT:  -- of speech stops when you get into

18   this courtroom.

19             MR. FEDYNSKY:  Sure.  I understand, your Honor.

20   But I think --

21             THE COURT:  That's -- I'm not bound by the First

22   Amendment for what people say here.  I can tell her to be

23   quiet, I can tell you to be quiet.

24             MR. FEDYNSKY:  Sure.  And we --

25             THE COURT:  Call the marshals down if you

1    aren't.

2         MR. FEDYNSKY:  And we accept limits even in the

3    public square on speech, your Honor.  And again, if you

4    watch that video and listen, what was deployed was a

5    barrier that allowed plenty of speech to happen and to be

6    shared.

7         And frankly, your Honor, if you look at the way

8    the capitol grounds are laid out, if you look at the way

9    that people were able to say and do what they wanted,

10   depending on where they were placed in those capitol

11   grounds, there is no substantial burdening of First

12   Amendment rights here such that it lines up with the other

13   cases.  It just, it doesn't line up with those other cases.

14   It may have been unfortunate that, you know, these folks

15   couldn't come together for the 25th anniversary and have a

16   joint event, but when police are facing a situation like

17   that where folks are competing for the same space that's a

18   public forum, they need to be given some level of

19   flexibility, some level of deference in terms of how to

20   achieve that.

21        THE COURT:  Well, yeah, you've put your finger

22   on it to me not as a judge so much that as a person, it's

23   regrettable that people that supposedly support the same

24   idea and are apparently everybody is very sensitive to

25   handicap rights and are pushing handicap rights, and that

-55-

1    goes for both the defendants and the plaintiffs.  I know

2    you have --

3              MR. SCHRAMM:  Your Honor, may I have --

4              THE COURT:  -- a good opportunity --

5              MR. SCHRAMM:  -- 30 seconds just to add on to

6    that?

7              THE COURT:  Yeah, just a minute.  Now you have a

8    good opportunity to destroy that joint effort, and that's

9    what you're in.  Anything you want to say?

10             MR. SCHRAMM:  Well, I -- if you don't mind.  I

11   think what you're getting at is that you didn't see that

12   when the plaintiffs have arrived at the statue or on the

13   capitol grounds there was a basis upon which for the police

14   to believe there was going to be some issue or concern that

15   required this kind of action.

16             THE COURT:  Okay.

17             MR. SCHRAMM:  And I think that's where your

18   question has been going, and I wasn't sure that --

19             THE COURT:  That's where it's going.

20             MR. SCHRAMM:  -- codefendant was getting at.

21   And there was that.  You had the rumors and concerns made

22   by the permittee that there was going to be disruption, so

23   the police now have knowledge.  The police are on the

24   grounds, and they see a group of people coming with signs

25   that are protesting the exact thing that's going on.  A

1    person showing up with a bullhorn, and you don't use

2    bullhorns to communicate with the person next-door.  You

3    use bullhorns, I mean let's not be silly, we all know what

4    they're used for.  They're used to disrupt an environment

5    and prevent the speaker from speaking.  You can look at any

6    university where they've been used.

7              So that's what the police were confronted with

8    at the time that this all occurred.  So you've got a group

9    of people with protesting signs and a bullhorn coming up,

10   exactly what the permittees thought was going to happen or

11   may happen, and the police begin to act.  And when they

12   begin to act it evolves.  It didn't evolve into a fence

13   first, it involved into, "Hey, what are you doing?  Where

14   are you going?  You can't disrupt the event."  And then it

15   evolved, "No, we're going to do what we want."  And I'm

16   just paraphrasing, I'm not trying to speak directly.

17             THE COURT:  I understand.

18             MR. SCHRAMM:  And then the fences go up and it

19   just keeps evolving.  And that's how the police operate.

20   They didn't know what the event was going to be.  Nobody

21   had a crystal ball.  And that's the difference here.  And

22   that's where their rights were not trampled upon.  That's

23   where they were given the right to protest and do whatever

24   they needed to do, and it's why it's different than the

25   cases cited.  Thank you, judge.

1          THE COURT:  Okay, thank you.  Final words,

2     Ms. Porter.

3          MS. PORTER:  Thank you, your Honor.  I really, I

4     can't believe some of what I'm hearing.  Mr. Fedynsky

5     argues there was no ejection from the grounds and no threat

6     of arrest.  Tell that to Mr. Harcz who was dragged through

7     the promenade, through the event in handcuffs by two

8     officers when he said that he was going in.  They

9     absolutely -- they absolutely ejected him from the grounds.

10    They absolutely threatened all of them with arrest if they

11    didn't comply with the orders.  So I'm not sure where that

12    comes from.

13         Mr. Fedynsky says that, you know, there's been

14    no briefing about the fact that this was a permitted event,

15    and so we have to give folks with the permit, you know what

16    would happen if people just came in.  Your Honor, we've

17    briefed that extensively.  The cases that we've discussed

18    today all deal with that issue, people who secure a permit,

19    it's still an event that's free and open to the public, but

20    somebody secures the permit and the cases say that that

21    does not matter, that does not privilege or prioritize the

22    permit holder's speech over that of others who wish to

23    attend.

24         And the general theme that I sense running

25    through both counsel's comments is, you know, whatever the

—58—

1        law says, it seems like it might be a good idea to just

2        sort of have people settle down.  It doesn't hurt them so

3        bad.  This did hurt my clients.  It really did, your Honor.

4        This was a complete shock.  It was very demoralizing to

5        them to see their state police standing there, people who

6        had done absolutely nothing wrong who were coming, they had

7        leaflets printed, they wanted to speak to people.  They

8        were not intent on any disruption.  They told the police

9        that when the police asked, "What are you here to do?"  "We

10       are here to use our voices.  We are here to use

11       conversations.  We want to pass out our leaflets."  To have

12       the State Police engage in that kind of conduct let others

13       in around them but keep them, that did harm them greatly.

14       It harmed their perceptions of government, it harmed their

15       faith that this is -- this is a nation of laws that are

16       governed fairly, and the idea that we should ignore decades

17       and decades of established caselaw and think, well, these

18       police have a tough job, they were just trying to do the

19       best they could, that's unacceptable, your Honor.

20            This is a nation of laws, and First Amendment

21       principles are extremely important.  The caselaw talks in

22       very, you know, flowery florid terms about the importance

23       of these because they are so fundamental to who we are as a

24       country.  Your Honor spoke about how particularly in this

25       day and age this is an important issue, and I agree with

1      the Court, it is.  To allow something like happened to my

2      clients to pass without holding these folks accountable for

3      their conduct is unacceptable and unlawful, your Honor.

4      This is a situation that has been addressed by the courts

5      many, many times, and it is imperative, particularly in a

6      time where we have folks who should be coming together, who

7      should be coming in agreement, not to silence voices of

8      people who dissent.

9           The caselaw speaks very eloquently that not only

10     when someone dissents, but especially when someone dissents

11     their voices should be heard.  That is what -- a

12     significant part of what the First Amendment is about.

13          I thank you -- thank you, your Honor, for your

14     careful attention to this, and if you have any other

15     questions, I'm happy to answer them.

16          THE COURT:  I don't.  Let me tell you the

17     problem.  I had hoped to make a ruling off the bench this

18     afternoon, but I'm not going to.  I will issue a decision

19     and it won't be a long opinion.  It will be a decision just

20     with what the decision is and then maybe some cites to

21     support it.

22          The problem is I'm headed to Europe this Sunday

23     and I'm not packed yet.  So I've got -- I don't think I'll

24     get it done before.  And then I'll get it done within 30

25     days though.  I'm going to be gone for a couple weeks, then

```
 1          I'm going to be back.

 2                    MR. FEDYNSKY:  Thank you, your Honor.

 3                    THE COURT:  Sorry about that.  But thank you

 4          very much for your presentations.

 5                    MR. SCHRAMM:  Thank you, your Honor.

 6                    MS. PORTER:  Thank you, your Honor.

 7                    MR. MEIHN:  Thank you, your Honor.

 8                    (At 3:22 p.m., proceedings concluded.)

 9                              -oo0oo-

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

CERTIFICATE OF REPORTER


        I, Bonnie L. Rozema, CER, do hereby certify that the
foregoing transcript consisting of 62 pages, is a complete,
true, and accurate transcript, to the best of my ability from
the audio recording, of the proceedings and testimony held in
this case on November 2, 2017.

        I do further certify that I prepared the foregoing
transcript.




/s/   Bonnie L. Rozema

Bonnie L. Rozema, CER-5571
2700 92nd Street, S.W.
Byron Center, MI  49315
(616) 878-9091


Notary Public in and for
Kent County, Michigan
My commission expires:
March 26, 2019
Acting in the County of Kent