UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

———————————————

PAUL JOSEPH HARCZ, JR., et al.,

               Plaintiffs,                              Case No. 1:17-cv-112

v.                                               HON. GORDON J. QUIST

BRODY BOUCHER, et al.,

               Defendants.
———————————————/

## MEMORANDUM OPINION & ORDER REGARDING MOTIONS FOR SUMMARY JUDGMENT

This case returned to this Court following the Sixth Circuit's reversal on Plaintiffs' First Amendment claims and Plaintiff Harcz's individual claims. Plaintiffs have moved for summary judgment on the First Amendment claims. (ECF No. 94.) Defendants have moved for summary judgment on all the claims. (ECF No. 99.) The motions are fully briefed, and the Court has heard oral argument. For the reasons stated below, Plaintiffs' motion is denied and Defendants' motion is granted in part and denied in part.

## BACKGROUND

Plaintiffs are a group of disability-rights advocates who planned to attend a public event celebrating the passage of the American Disabilities Act (ADA) on the Michigan State Capitol grounds. Guest speakers at the event included the lieutenant governor and several legislators. Prior to the event, the state police received two reports suggesting a possible protest at the event. In the first phone call, the caller said that he had recently spoken with a "disgruntled person who planned on protesting at the event." (ECF No. 95-16 at PageID.1531.) The caller "indicated the person did not state the protest was violent[,] however, had been promoting this activity on social

media." (*Id.*)  In the second call, the caller requested to use the east lawn of the Capitol on the day of the event to protest the event. The caller said she was bringing a "freedom bus," expected 25-500 people, and was affiliated with the National Federation for the Blind, Detroit. (*Id.*)  The caller also said that she expected it to be a "peaceful protest."  (ECF No. 95-14 at PageID.1512.)  Based on these calls, Sergeant Jeffrey Held spoke with the event organizers, and they agreed to prevent Plaintiffs from freely entering the stage-area of the event. Instead, the state police set up a separate area on the Capitol grounds by the Austin Blair Statue where Plaintiffs could gather and voice their opinions during the event.

Shortly before the event started, the state police confronted ten to fifteen people (including the seven Plaintiffs) as they headed toward the stage area.  The state police, led by Sergeant Held, informed Plaintiffs that they were not allowed to enter the "reserved event," and the situation escalated. (ECF No. 95-20 at PageID.1564.)  Several members of the state police stood in a line preventing Plaintiffs from freely entering the stage area. Attempts to mediate were unsuccessful, and the state police set up metal barricades.  Twenty-five minutes later, Plaintiff Harcz, who is legally blind, shouted multiple times that he was going in and asked others if they were filming. An altercation occurred, which led to Harcz being arrested and charged with assaulting and obstructing an officer. After a probable cause hearing, the state district court bound Harcz over to the state circuit court for trial. However, on the eve of trial before the Michigan Circuit Court, the interim county prosecutor, who happens to be Michigan's current governor, dismissed Harcz's criminal charge.

Plaintiffs allege that Defendants, consisting of nine Michigan State Police officers and the former facilities director at the Capitol, violated their First Amendment rights.  Harcz also asserts

false arrest, false imprisonment, and malicious prosecutions federal and state law claims against

three Defendants—Sergeant Edwin Henriquez, Trooper Ryan Davis, and Officer Brian George.[1]

In 2017, this Court granted Defendants' motion to dismiss.  (ECF No. 47.)  After reviewing

Plaintiffs' allegations and the video evidence that was referenced in the Complaint, this Court held

that Defendants were entitled to qualified immunity on the First Amendment claims because it was

not clearly established that the officers were required to wait for the Plaintiffs to disrupt the event

given the circumstances.  (*Id.* at PageID.621-627.)  This Court wrote:

> As for the validity of the restriction, Plaintiffs fail to cite any case from the Supreme
> Court or the Sixth Circuit addressing the issue: whether police officers may take
> preemptive action to ensure a permit-holder's right to convey its message at its own
> event without disruption from protestors, even though the protestors have not yet
> disturbed the event and may never do so. Are police officers allowed to intervene
> in order to preserve the peace and prevent disruption of a permitted event? Can the
> police act on the event organizer's stated fear that there may be a disturbance?
> Maybe not because such preemptive action may be instigated despite the unknown
> fact of whether there was a true threat of a disturbance. Or, in order to be safe from
> a § 1983 claim, do the police officers have to wait in order to be absolutely sure
> that a disturbance of a permitted meeting may occur? Maybe not because having to
> break up a disturbance after it has started risks injury to the police as well as
> attendees at the permitted event. Who do the police believe regarding the threat of
> a disturbance, and what do they do about it—act or wait? And if there is a
> disturbance and injuries after the warning by event organizers, do the officers risk
> liability to those in attendance for not having protected their right to free speech
> and personal safety? This is a "Damned if you do, and damned if you don't"
> scenario.

(*Id.* at PageID.621-622.)  This Court also distinguished this case from other cases based on the

attributes of the venue. Unlike the many cases that involved festivals in open streets and park

grounds, *see Bible Believers v. Wayne Cnty.*, 805 F.3d 228, 234 (6th Cir. 2015); *Bays v. City of*

*Fairborn*, 668 F.3d 814, 818 (6th Cir. 2013); *Saieg v. City of Dearborn*, 641 F.3d 727, 730-32 (6th

---

[1] Harcz initially asserted his individual claims against Officer Stephen Thomas, Lieutenant Jason Williams, and Sergeant Held but no longer intends to proceed with those claims. (ECF No. 102 at PageID.2035 n.2.) Accordingly, Harcz's individual claims against Officer Thomas, Lieutenant Williams, and Sergeant Held will be dismissed.

Cir. 2011); *Parks v. City of Columbus*, 395 F.3d 643, 645-46 (6th Cir. 2005), the permitted area in the instant case was a "much more compact venue, leaving less space for discordant speakers without a likely disruption of the event and few alternatives for accommodating such speakers." (*Id.* at PageID.626.)

This Court also dismissed Harcz's individual claims and held that a reasonable officer would have concluded that probable cause existed to arrest Harcz.  (*Id.* at PageID.630.) While the video evidence did not show the entire incident, this Court concluded "Harcz's yelling, aggressive use of his walking cane, clearly-expressed intent to push through, and attempting to push through the officers provided adequate grounds to arrest, detain, and initiate a prosecution against him." (*Id.* at PageID.630.)

On May 20, 2019, the Sixth Circuit reversed.  *Harcz v. Boucher*, 763 F. App'x 536, 542 (6th Cir. 2019).  It began by noting that it is generally inappropriate for a district court to grant a motion to dismiss on the basis of qualified immunity.  *Id.* at 541-42. The Sixth Circuit wrote that "[a]t this stage, [Plaintiffs] plausibly allege a First Amendment violation because they claim that the state defendants prevented them from accessing a traditional public forum to exercise their speech rights before they posed any concrete threat of disruption."  *Id.* at 542.   In rejecting Defendants' arguments regarding the video evidence, the Sixth Circuit found that videos were not helpful because they depicted what happened only after the police excluded Plaintiffs from the event.  *Id.* at 543.  The Sixth Circuit concluded that since Plaintiffs alleged that they posed no threat of disruption before the police excluded them from the event, the police's "interests of crowd control, safety, and preventing a heckler's veto '[were] merely "conjectural," as opposed to "real."'"  *Id.* at 543 (quoting *Saieg,* 641 F.3d at 736-37). The Sixth Circuit then held that this law was clearly established:

Accepting the allegations in the complaint, precedent clearly established that the state defendants violated the appellants' First Amendment rights. Over ten years before the events in this case, *Parks* established that "one's constitutionally protected rights" do not "disappear because a private party is hosting an event that remain[s] free and open to the public." 395 F.3d at 652; *see also Teesdale v. City of Chicago*, 690 F.3d 829, 834 n.1 (7th Cir. 2012) (citing *Parks*); *Gathright v. City of Portland*, 439 F.3d 573, 578–79 (9th Cir. 2006) (same). As a result, cases stretching back decades requiring that a significant government interest support a valid time, place, and manner restriction controlled here. *See Perry Educ. Ass'n.*, 460 U.S. at 45, 103 S. Ct. 948 (collecting cases). In addition, previous decisions of this court and the Supreme Court clarify that the government must demonstrate the reality of an asserted interest when justifying speech restrictions and that mere conjecture will not suffice. *See Turner*, 512 U.S. at 664, 114 S. Ct. 2445; *Saieg*, 641 F.3d at 736–37; *Bays v. City of Fairborn*, 668 F.3d 814, 823–24 (6th Cir. 2012).

Moreover, *Startzell v. Philadelphia*, an analogous case that the district court discussed at length, provided a blueprint for proper police action under the circumstances. *See* 533 F.3d at 198–99. There, the officers allowed protestors to enter a permitted event held in a public forum and imposed a constitutionally-permissible restriction only after "protestors move[d] from distributing literature and wearing signs to disruption of the permitted activities." *Id.* at 199. Accepting the appellants' allegations as true, these cases placed the state defendants' constitutional violation beyond debate. *See al-Kidd*, 563 U.S. at 741. We therefore reverse dismissal of the appellants' First Amendment claim.

*Harcz*, 763 F. App'x at 543.

As to Harcz's individual claims, the Sixth Circuit reversed the probable cause ruling because "[w]ith more than one reasonable determination possible, the probable cause finding should not occur at the pleading stage." *Id.* at 545. This case was remanded back to this Court to consider the governmental immunity defense to Harcz's state-law claims and qualified immunity to his Fourth Amendment claims. *Id.*

## **LEGAL STANDARD**

Summary judgment "shall" be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party moving for summary judgment can satisfy its burden by demonstrating "that the respondent, having had sufficient opportunity for discovery, has no evidence to support an

essential element of his or her case." *Minadeo v. ICI Paints*, 398 F.3d 751, 761 (6th Cir. 2005). Once the moving party demonstrates that "there is an absence of evidence to support the nonmoving party's case," the non-moving party "must identify specific facts that can be established by admissible evidence, which demonstrate a genuine issue for trial." *Amini v. Oberlin Coll.*, 440 F.3d 350, 357 (6th Cir. 2006). While the Court must view the evidence in the light most favorable to the non-moving party, the party opposing the summary judgment motion "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* The existence of a mere "scintilla of evidence" in support of the non-moving party's position is insufficient. *Daniels v. Woodside*, 396 F.3d 730, 734-35 (6th Cir. 2005). The non-moving party "may not rest upon [her] mere allegations," but must instead present "significant probative evidence" establishing that "there is a genuine issue for trial." *Pack v. Damon Corp.*, 434 F.3d 810, 813-14 (6th Cir. 2006).

## ANALYSIS

### I.      First Amendment Claims

All parties have moved for summary judgment on the First Amendment claims. Plaintiffs argue that Defendants imposed a content-based restriction that survives neither strict nor intermediate scrutiny. Defendants contend that the restriction was a reasonable time, place, and manner restriction that meets the intermediate scrutiny standard and that they are entitled to qualified immunity.

Qualified immunity involves a "two-tiered inquiry." *Jones v. Clark Cnty.*, 959 F.3d 748, 766 (6th Cir. 2020) (quoting *Martin v. City of Broadview Heights*, 712 F.3d 951, 957 (6th Cir. 2013)). "First, taken in the light most favorable to the party asserting the injury, do the facts alleged show that the officer's conduct violated a constitutional right? Second, is the right clearly

established?" *Seales v. City of Detroit*, 724 F. App'x 356, 359 (6th Cir. 2018) (quoting *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006)). "Once raised, the plaintiff bears the burden of showing that a defendant is not entitled to qualified immunity." *Bletz v. Gribble*, 641 F.3d 743, 750 (6th Cir. 2011) (citing *Ciminillo v. Streicher*, 434 F.3d 461, 466 (6th Cir. 2006)). This Court will first address the alleged constitutional violation and then turn to whether the law was clearly established.

### A. Constitutional Violation

The First Amendment prohibits the government from "abridging the freedom of speech." U.S. Const. amend. I.  Free speech claims require a three-step inquiry.  *Parks,* 395 F.3d at 647. The first step is to decide whether Plaintiffs were engaged in protected speech.  *Id.*  The second step is to identify the nature of the forum.  *Id.*  The third step is to determine "whether the justifications for exclusion from the relevant forum satisfy the requisite standard."  *Saieg*, 641 F.3d at 734-35 (6th Cir. 2011) (quoting *Cornelius v. NAACP Legal Def. and Educ. Fund, Inc.*, 473 U.S. 788, 797, 105 S. Ct. 3439, 3446 (1985)).

Here, the first two steps are not disputed.  Plaintiffs' conduct was protected speech.  They planned to attend the event to celebrate the passage of the ADA but also to express their displeasure in (1) the event being held at a location that allegedly does not comply with the ADA, and (2) the event being sponsored by a company that pays less than minimum wage to some of its disabled workers.  "The Supreme Court has made clear that an individual's speech is protected even if it does 'not meet standards of acceptability' from the potential audience's view." *Bays*, 668 F.3d at 824 (quoting *Org. for a Better Austin v. Keefe*, 402 U.S. 415, 419, 91 S. Ct. 1575, 1578 (1971)).

In addition, the Michigan State Capitol grounds, like the United States Capitol grounds, constitute a traditional public forum.  *See Grosjean v. Bommarito*, 302 F. App'x 430, 439 (6th Cir.

2008) (noting that "grounds in front of a government capitol building" is an example of a traditional public forum); *Michigan Up & Out of Poverty Now Coal. v. State of Michigan*, 210 Mich. App. 162, 172, 533 N.W.2d 339, 345 (1995) ("The Capitol grounds constitute a traditional public forum, where the right to free speech is closely guarded."); *Community for Creative Non-Violence v. Kerrigan*, 865 F.2d 382, 387 (D.D.C. 1989) ("There is no doubt that the Capitol [g]rounds are a public forum . . . ."). Although the ADA event organizers obtained a permit and set up a stage for guest speakers, the Capitol grounds remained open to the public. As depicted in the video, there were several vendor booths and tents set up on the event grounds where members of the public could go without any restriction.

The parties disagree on the level of scrutiny under the third step. In a traditional public forum, the level of scrutiny depends on whether the restriction was content-based or content-neutral. If Defendants restricted Plaintiffs' speech because of its content, the court applies strict scrutiny—the restriction must be "narrowly tailored to be the least-restrictive means available to serve a compelling government interest." *Bible Believers*, 805 F.3d at 248. If Defendants had a content-neutral reason for enforcing a time, place, and manner restriction on Plaintiffs' speech, the court applies intermediate scrutiny—the restriction need only be "narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." *M.A.L. ex rel. M.L. v. Kinsland*, 543 F.3d 841, 850 (6th Cir. 2008).

### 1. Content Neutrality

"Government regulations of speech are content neutral if they are 'justified without reference to the content or viewpoint of the regulated speech.'" *Saieg,* 641 F.3d at 735 (quoting *Christian Legal Soc'y v. Martinez*, 561 U.S. 661, 696, 130 S. Ct. 2971, 2994 (2010)). "The government's purpose is the controlling consideration. A regulation that serves purposes unrelated

8

to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S. Ct. 2746, 2754 (1989).

Defendants contend that they did not exclude Plaintiffs from the event but segregated Plaintiffs from other attendees because Plaintiffs posed both a threat to public safety and to disrupting a permitted event.[2]  Both of these reasons can be considered content neutral justifications.  *See Saieg*, 641 F.3d at 735 ("'[T]he State's interests' in crowd control and public safety 'are unrelated to the content of [the regulated] speech.'") (quoting *Hill v. Colorado*, 530 530 U.S. 703, 719-20, 120 S. Ct. 2480, 2491 (2000)); *Startzell v. City of Philadelphia*, 533 F.3d 183, 198-99 (3d Cir. 2008) ("The principle of content neutrality does not divest police officers of the ability to enforce valid permits and to ensure that permitted speech is allowed to take place.").

In response, Plaintiffs claim that Defendants prevented their access to the event because the event organizers asked them to.  Even if a group has a permit in a traditional public forum, the group does not have untethered power to exclude people from the event.  *See Parks,* 395 F.3d at 653-54 (holding that the restriction was content-based when the plaintiff was acting in a peaceful manner and the only difference between him and others was his message and the fact that the event sponsor did not want him there); *see also McGlone v. Metro Gov't of Nashville*, 749 F. App'x 402, 416 (6th Cir. 2018) (Moore, J., dissenting) ("[A] permit-holder cannot use the law to exclude somewhat more modest forms of purported interference—for example, 'peaceful' leafleters—from public fora.").

Here, there is evidence in the record from which a reasonable jury could conclude that the restriction was not, in fact, content neutral.  Defendants concede that "it was unknown exactly

---

[2] Defendants' purpose for the restriction is further discussed in the significant governmental interest section below.

what manner of protest was to be expected" prior to the event. (ECF No. 100 at PageID.1620.) Sergeant Held met with event organizers the morning of the event to discuss the plan. He explained that "if [the protestors were] invited in, then they're part of a group, and then we would have to treat them as a part of [the event organizer's] group and not a separate opposing viewpoint." (ECF No. 95-15 at PageID.1521.) He left it to the event organizers to decide if they wanted to include the alleged protestors in the celebration. (*Id.*) The event organizers decided to not include the protestors, and Sergeant Held abided by their wishes. (*Id.*) Based on these facts, a reasonable jury could conclude that the restriction imposed by Defendants was content based. *See Lowery v. Jefferson Cnty. Bd. of Educ.*, 586 F.3d 427, 435 (6th Cir. 2009) (noting that "the mixed-motive inquiry is one for the jury, not for [the court], to decide").

Because a question of fact exists as to whether the restriction was content based, Defendants do not show that a constitutional violation did not occur. Plaintiffs, however, may still prove a constitutional violation if (1) the restriction was not narrowly tailored to serve a significant government interest, or (2) the restriction did not leave open ample alternative channels of communication.

### 2. Narrowly Tailored to Serve a Significant Government Interest

"To be a constitutional time, place, and manner restriction, the [restriction] must be narrowly tailored to serve a significant government interest." *Bays*, 668 F.3d at 822 (citing *United States v. Grace*, 461 U.S. 171, 177, 103 S. Ct. 1702, 1707 (1983)). The government must demonstrate that the recited harms are real, not merely conjectural. *Saieg,* 641 F.3d at 736-37.

Defendants do not specifically identify a significant government interest. Instead, they provide a list of important state interests that other courts have recognized. (ECF No. 100 at PageID.1651.) Of these important state interests, the two most applicable are ensuring the safety

10

of the public and ensuring that permitted speakers are able to engage effectively in expressive activities.  Defendants also raise the issue of preventing a heckler's veto. "A heckler's veto is an impermissible content-based restriction on speech where the speech is prohibited due to an anticipated disorderly or violent reaction of the audience." *Startzell*, 533 F.3d at 200; *see also Gerber v. Herskovitz*, No. 20-1870, __ F.4th __, 2021 WL 4187844, at *12 (6th Cir. Sept. 15, 2021) (Clay, J., concurring) ("While the heckler's veto is normally concerned with outbreaks of violence against the speaker—to justify either failing to protect the speaker against such violence or preventing the speaker from speaking in an effort to avoid violence in the first place—it represents a broader prohibition against allowing those who oppose the content of certain speech to force the government to censor that speech."). As the Court understands Defendants' argument, the heckler's veto in the instant case would have been the police restricting the event speakers' speech in order to maintain a safe environment. But there is no evidence in the record showing that Defendants were contemplating shutting the event down or restricting the event speakers' speech in any way. A heckler's veto can also be defined as "[a]n interruptive or disruptive act by a private person intending to prevent a speaker from being heard, such as shouting down the speaker, hurling personal insults, and carrying on loud side-conversations." Heckler's Veto, *Black's Law Dictionary* (11th ed. 2019). Applying this definition to the instant case, the interest of preventing a heckler's veto is similar to the interest of preventing the disruption of a permitted event.

Plaintiffs have submitted evidence that Defendants had already received a report that the protest was expected to be peaceful. The operational plan provided "[n]o issues [were] anticipated with this group." (ECF No. 95-12 at PageID.1495.)  There is no reference in the record to any weapon, and Plaintiffs are, with one exception, all disabled.

11

Defendants' belief that Plaintiffs had ties with ADAPT[3] came directly from one of the event organizers and contradicted an earlier report that Defendants had received. Only one Defendant, Sergeant Held, had some familiarity with ADAPT. He recalled two incidents involving ADAPT protestors. The first incident occurred in 1993 or 1994 when a member of ADAPT climbed the fence of the governor's residence before being arrested. (ECF No. 100-4 at PageID.1698-1700.) The second incident, which occurred in 1998 or 1999, involved members of ADAPT throwing fecal material and urine bags at students as the students toured the Capitol. (*Id.* at PageID.1699.) As it turns out, only Harcz is affiliated with ADAPT, and he had no involvement in the prior ADAPT protests. Even so, the fact that members of ADAPT were involved in two violent protests nearly two decades earlier does not make a threat to public safety more likely than not: "'[M]ere speculation about danger' is not an adequate basis on which to justify a restriction of speech.'" *Saieg*, 641 F.3d at 739 (quoting *Bay Area Peace Navy v. United States*, 914 F.2d 1224, 1228 (9th Cir. 1990)).

Whether Plaintiffs posed a real threat to disrupting the event is a close call. Each Plaintiff claims having had no such intent. They showed up with signs and flyers and claim that they intended to peacefully voice their concerns to other event attendees. (ECF Nos. 95-3 at PageID.1421; 95-5 at PageID.1433-1434; 95-6 at PageID.1446; 95-8 at PageID.1455.) And while one Plaintiff brought a bullhorn to the event as a "contingency" plan, Defendants told her that she could not use it, and she never did. (ECF Nos. 100-7 at PageID.1752-1753; 100-12 at PageID.1868.)

As stated above, Defendants state that "it was unknown exactly what manner of protest was to be expected." (ECF No. 100 at PageID.1620.) What they did know was:

---

[3] According to Harcz, ADAPT is a "national organization of people with disabilities. It began around 1982, and it is a non-violent civil disobedience group to get things done." (ECF No. 95-2 at PageID.1406.)

- They knew a group of people who were initially part of planning the event were unhappy with the event location and one of the sponsors.

- They knew "friendships were lost" during the planning of the event. (ECF No. 100-4 at PageID.1702.)

- They knew that the event guest speakers were distinguished people who intended to address the audience.

- They knew the event organizers had some concern that there might be a disruption.

- They knew the event organizers spent considerable amount of time and money planning the event.

- They had conflicting information on whether the group was associated with ADAPT.

- They knew a "freedom bus" was coming but did not know what that meant. (ECF No. 100-4 at PageID.1694.)

In the Court's view, a reasonable jury could conclude that Plaintiffs did not pose a real threat of disrupting the event when Defendants first stopped Plaintiffs.

Furthermore, Defendants' arguments about what transpired after they initially stopped Plaintiffs from entering the event, such as Plaintiffs yelling "shut it down" and "we haven't done anything illegal *yet*" as well as Harcz's subsequent arrest, are not particularly helpful at this stage. The Sixth Circuit wrote that, if Plaintiffs "posed no threat of disruption before the police excluded them from the event," then the asserted government interests could not justify their initial exclusion. *Harcz*, 763 F. App'x at 543.  Ultimately, whether Plaintiffs posed a real threat of disruption is a question to be resolved by the jury.  And because it is unclear whether Plaintiff posed a real threat of disruption, the Court cannot discern whether the restriction was narrowly tailored.

### 3.  Ample Alternative Avenues

A constitutional time, place, and manner restriction "must leave open ample alternative channels by which speakers can communicate their messages, although speakers are 'not entitled to [their] best means of communication.'" *Saieg*, 641 F.3d at 740 (quoting *Phelps-Roper v. Strickland*, 539 F.3d 356, 372 (6th Cir. 2008)).  The parties dispute the distance between the designated area and the event.  They also dispute whether Plaintiffs were fully excluded from the event.  Neither issue is dispositive.  *See id.* at 741 ("Our holding is not predicated on the boundaries of the Festival or a distinction between the inner and outer perimeters.").  "The key for purposes of the adequate-alternatives analysis is whether the proffered alternatives allow the speaker to reach its intended audience." *Contributor v. City of Brentwood*, 726 F.3d 861, 865 (6th Cir. 2013).  According to Plaintiffs, they were cordoned off from the event—restricting them from reaching their intended audience by passing out leaflets and holding signs.  According to Defendants, Plaintiffs had reasonable access to the Capitol grounds and the ADA event.  There is conflicting evidence on whether Plaintiffs were able to communicate with the event audience.  The conflicting evidence creates a question of fact to be resolved by a jury.

### B.  Clearly Established

The next question is whether the right was clearly established. In order for a right to be clearly established, it must be established "in a 'particularized' sense so that the 'contours' of the right are clear to a reasonable official." *Reichle v. Howards*, 566 U.S. 658, 665, 132 S. Ct. 2088, 2094 (2012) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034, 3039 (1987)). "[T]he clearly established law must be 'particularized' to the facts of the case," and "in the light of pre-existing law the unlawfulness must be apparent." *White v. Pauly*, __ U.S. __, 137 S. Ct. 548, 552 (2017) (quoting *Anderson*, 483 U.S. at 540, 107 S. Ct. at 3049).  In order for a reasonable

official to understand that he or she could violate a clearly established right, the courts "do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate."  *Ashcroft v. al–Kidd*, 563 U.S. 731, 741, 131 S. Ct. 2074, 2083 (2011); *see also Hart v. Hillsdale Cnty*., 973 F.3d 627, 641 (6th Cir. 2020).

This Court previously explained why it believed that the law was not clearly established. The Sixth Circuit, however, reversed.  The record has developed, but the crux of the case remains the same. Plaintiffs, a group of about seven handicapped people, claim that they had no intention of disrupting the event.  Defendants had conflicting information about a possible protest and consulted with event organizers before putting up the barrier to prevent Plaintiffs from entering the event like other attendees.  The only new material fact as to Defendants' expectations is that Sergeant Held believed that Plaintiffs were part of ADAPT, and he recalled two prior incidents where ADAPT was involved in violent protests.

Defendants argue that they did reasonable police work based on incomplete information. On the one hand, if Plaintiffs had entered the event and become disruptive, then Defendants could try to remove Plaintiffs from the event in order to protect the ADA event organizers' rights to free speech.  *See, e.g.*, *Startzell*, 533 F.3d at 199 (stating that "when protestors move from distributing literature and wearing signs to the disruption of the permitted activities, the existence of the permit tilts the balance in favor of the permit-holders"); *Gathright v. City of Portland*, 439 F.3d 573, 577-78 (9th Cir. 2006) (holding that allowing permittees to exclude whom they wanted from the event was not narrowly tailored to the legitimate interest of protecting the permittees' right to speak). But, if Defendants barred Plaintiffs from the event simply because the event organizers asked them to do so, the restriction was unreasonable.  *See Parks*, 395 F.3d at 652 ("[O]ne's constitutionally protected rights [do not] disappear because a private party is hosting an event that remained free

and open to the public.").  The law was clearly established that individuals are free to speak in public forums despite discordant views as long as they remain peaceful and do not disrupt or otherwise alter the permitted event's message.

This is not the end of the qualified immunity analysis. Because qualified immunity is an individual defense, this Court must "assess each actor's liability on an individual basis." *Jones v. City of Elyria*, 947 F.3d 905, 913 (6th Cir. 2020). "This principle follows from the Supreme Court's instruction that public officials be held accountable for their own actions, but not the actions of others." *Id.* In evaluating each Defendant's liability, the relevant inquiry is "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202, 121 S. Ct. 2151, 2156 (2001).

Defendants suggest that Sergeant Held was the only individual who had the requisite personal involvement to establish liability under 42 U.S.C. § 1983.  The proper defendants under § 1983 are officers who were personally involved in a violation of the plaintiffs constitutional rights. *Gregory v. City of Louisville*, 444 F.3d 725, 759 (6th Cir. 2006). Assuming that the restriction violated the First Amendment, any Defendant who formed the line preventing Plaintiffs from freely entering the event had the requisite personal involvement in the alleged constitutional violation.  Thus, the seven Defendants who formed the line—Sergeant Held, Sergeant Henriquez, Officer Cooks, Officer Munoz, Officer Davis, Officer Thomas, and Officer George—could have had the requisite personal involvement in the alleged constitutional violation.

Defendants also claim that Sergeant Henriquez, Officer Cooks, Officer Munoz, Officer Davis, Officer Thomas, and Officer George, did not make the decision to keep the groups separate. This statement appears to suggest that these Defendants are entitled to qualified immunity because they were following orders.  Sergeant Henriquez and the other line officers were put on notice that

the restriction was unlawful because they were all aware that Plaintiffs were excluded from a public event at the request of the event organizers.  At the initial interaction, Sergeant Held told Plaintiffs that they were not allowed into the event because the event organizers did not want them there. Trooper Davis was present at this interaction. Sergeant Henriquez later made a similar statement to one of the Plaintiffs. While Officers Cooks and Munoz were not present at the initial interaction, they both were in the line at approximately 11:01 a.m. (ECF No. 95-20 at PageID.1564.)  The video shows that, at 11:10 a.m., Plaintiffs and Defendants were continuing to discuss the fact that it was the event organizers who made the decision to prevent Plaintiffs from entering the event. (ECF No. 95-27 at 11:10 a.m.)  Thus, Sergeant Henriquez and the other line officers were all aware that Plaintiffs were prevented from free access to the event based on the event organizers' request. They cannot avoid liability by claiming they were just following orders. Viewing the evidence in the light most favorable to Plaintiffs, a reasonable official in each of the seven Defendants position should have known that preventing Plaintiffs from entering a public event at the request of the event organizers was unlawful.

Capitol Facilities Director Dan Brocklehurst, however, played no role in forming the line or making the initial decision to separate Plaintiffs from the open grounds. He was called after the restriction was already in place, and he attempted to mediate between Plaintiffs and the event organizers. He is not a police officer, and there is no evidence that he had any authority to intervene in what was occurring or about to occur.  Because a reasonable official would not have known that his conduct was unlawful, Brocklehurst is entitled to qualified immunity.

The final two Defendants, First Lieutenant Brody Boucher and Lieutenant Jason Williams, were the supervisors of the Michigan State Police Defendants.  In order to succeed on a supervisory liability claim, Plaintiffs must show that "a supervisory official at least implicitly authorized,

17

approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate." *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984). "While a supervisor must have engaged in 'some active unconstitutional behavior,' that behavior need not be "active" in the sense that the supervisor must have physically put his hands on the injured party or even physically been present at the time of the constitutional violation." *Peatross v. City of Memphis*, 818 F.3d 233, 242-43 (6th Cir. 2016). "At a minimum a plaintiff must show that the official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." *Hays v. Jefferson Cnty.*, 668 F.2d 869, 874 (6th Cir. 1982)).

In the instant case, neither First Lieutenant Boucher nor Lieutenant Williams was present when the event organizers made the request that Plaintiffs be barred from entering the event and Sergeant Held agreed.  The record establishes that Sergeants Held and Henriquez were in constant contact with their supervisors throughout the event.  Sergeant Henriquez testified that he contacted both First Lieutenant Boucher and Lieutenant Williams because he was concerned with the legality of completely preventing Plaintiffs from entering the public event. (ECF No. 95-17 at PageID.1551-1552.)  He also testified that Lieutenant Williams gave the order to block Plaintiffs from entering the event.[4]  (ECF No. 95-17 at PageID.1550.)  Lieutenant Williams testified that he believed the decision to keep the groups separate came from First Lieutenant Boucher. (ECF No. 95-13, PageID.1509.) Based on the record, a reasonable jury could conclude that First Lieutenant Boucher and Lieutenant Williams "at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers."  *Hays*, 668 F.2d at 874. Therefore, neither First Lieutenant Boucher nor Lieutenant Williams is entitled to qualified immunity.

---

[4] There is an issue of fact as to whether Plaintiffs were actually barred from the event in that they had a place reserved for them near the main point of the event.

In sum, questions of fact exist as to whether the initial restriction was (1) content-based, (2) narrowly tailored to serve a significant government interest, and (3) left open ample alternative channels of communication.  The law was clearly established that Defendants could not bar Plaintiffs from the event because the event organizers asked them to. With the exception of Defendant Brocklehurst, a reasonable official would have known that each Defendant's conduct was unlawful.

## II.      Harcz's Individual Claims

Defendants move for summary judgment on Harcz's individual claims of false arrest[5] and malicious prosecution.  Although Harcz asserts both state and federal claims, they are quite similar and many of Defendants' arguments overlap and apply to both the federal and state law claims.

### A.  False Arrest

Defendants' main argument is that the existence of probable cause defeats each of Harcz's individual claims.  In the false arrest context, "a probable cause determination depends on whether, at the moment of arrest, 'the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense.'" *Harcz*, 769 F. App'x at 544 (quoting *Beck v. Ohio*, 379 U.S. 89, 91, 85 S. Ct. 223, 225 (1964)).  "A reviewing court must assess the existence of probable cause 'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 302 (6th Cir. 2005) (quoting *Klein v. Long*, 275 F.3d 544, 550 (6th Cir. 2001)).

---

[5] The Court will refer to the false imprisonment claim as part of the false arrest claim. *See Weser v. Goodson*, 965 F.3d 507, 513 (6th Cir. 2020) ("When a false-imprisonment claim arises out of an alleged false arrest—as it does in this case—those claims are identical, so we will simply refer to those two claims together as a false-arrest claim.").

Harcz was arrested for violating Mich. Comp. Laws § 750.81d(1), which criminalizes the assaulting, battering, wounding, resisting, obstructing, opposing, or endangering a person performing his or her duties.  At issue in this case is whether a reasonable officer would have had probable cause to arrest Harcz for resisting and obstructing.  This Court previously held that a reasonable officer would have had probable cause, but the Sixth Circuit reversed because Harcz alleged that the officers grabbed him and pulled him across the line.  In their summary judgment motion, Defendants argue that the video evidence and state court rulings support their argument. But the Sixth Circuit has already held that the video evidence is not enough and that the state court rulings do not prevent this Court from relitigating the issue.  Defendants also rely on Harcz's deposition testimony to show that he was disorderly and agitated. But Harcz's emotional state is clearly depicted in the video.  Nothing in the record has materially changed since the Sixth Circuit's opinion.  Deposition testimony supports Defendants' *and* Harcz's versions of events, and the video evidence remains inconclusive.

In some circumstances, a court may be able to sidestep disputed versions of events to conclude that a reasonable officer would have had probable cause. For example, in the releativley recent case of *Nieves v. Bartlett*, __ U.S. __, 139 S. Ct. 1715, 1720-21 (2019),[6] Sergeant Nieves observed Bartlett aggressively approach and yell at Trooper Weight, which prompted Trooper Weight to push Bartlett. Bartlett, on the other hand, claimed that he did not act aggressively and was trying to yell over loud music.  *Id.* at 1721. Despite the different stories, the Supreme Court affirmed the lower court's probable cause finding—"'a reasonable officer in Sergeant Nieves's position could have concluded that Bartlett stood close to Trooper Weight and spoke loudly in order to challenge him, provoking Trooper Weight to push him back.'"  *Id.* at 1728 (quoting

---

[6] *Nieves* was decided eight days after the Sixth Circuit's decision in the instant case.

*Bartlett v. Nieves*, 712 F. App'x 613, 615 (9th Cir. 2017)). There is no way to avoid the parties'
differing accounts in this case. Whether Harcz hit and/or pushed pass the officers, which several
officers claim happened, or whether the police officers pulled Harcz down and across the police
line, which at least two Plaintiffs claim happened, is a question of fact that must be decided by the
jury. *See Radvansky,* 395 F.3d at 302 ("Determining whether probable cause existed[] presents a
jury question, unless there is only one reasonable determination possible."); *Osberry v. Slusher*,
750 F. App'x 385, 392 (6th Cir. 2018) ("In general, the existence of probable cause in a § 1983
action presents a jury question, unless there is only one reasonable determination possible.")
(quoting *Parsons v. City of Pontiac*, 533 F.3d 492, 501 (6th Cir. 2008)).[7]

Officer George argues that he was not personally involved in arresting Harcz. Officer
George's precise role in arresting Harcz is not entirely clear. He filled out the initial arrest report
but claims that he was not involved in the arrest. Another officer, however, testified that Officer
George was the arresting officer. (ECF No. 100-10, PageID.1821.) The record establishes a
question of fact as to whether Officer George had sufficient personal involvement in Harcz's arrest.

### B. Malicious Prosecution

Defendants appear to argue that they did not participate in the prosecution. "This element
is met when an officer includes 'misstatements and falsehoods in his investigatory materials' and
those materials influence a prosecutor's decision to bring charges." *Jackson v. City of Cleveland*,
925 F.3d 793, 821 (6th Cir. 2019) (quoting *Sykes v. Anderson,* 625 F.3d 294, 316 (6th Cir. 2010)).
However, "even false testimony is not actionable as malicious prosecution unless deliberate—i.e.,
given with knowledge of, or reckless disregard for, its falsity." *Johnson v. Moseley*, 790 F.3d 649,

---

[7] Defendants also fail to address the issue of whether it is well established in Michigan that there is a common-
law right to resist unlawful orders and arrests. *People v. Moreno*, 491 Mich. 38, 41, 814 N.W.2d 624, 625 (2012).

655 (6th Cir. 2015). "[A] defendant's participation must be marked by some kind of blameworthiness, something beyond mere negligence or innocent mistake, to satisfy the elements of a malicious prosecution claim under the Fourth Amendment." *Id*.  If the claim is predicated on an officer's testimony at a preliminary hearing, the plaintiff must show that the officer "stated a deliberate falsehood or showed reckless disregard for the truth at the hearing and that the allegedly false or omitted information was material to the court's finding of probable cause." *Sykes*, 625 F.3d at 312. Likewise, if a claim of malicious prosecution is based on an officer's investigative materials, the plaintiff must prove that the materials contained false information. *Id*. at 314.

Here, Harcz has submitted enough evidence to create of question of fact. As stated above, the parties dispute what exactly occurred. In the state proceedings, Sergeant Henriquez testified that Harcz tried to push through him while Officer George and Trooper Davis filled out reports stating that Harcz tried to push past. Perhaps more importantly, Sergeant Henriquez and Trooper Davis also claimed that Harcz was hitting officers between their legs with his cane and the state circuit court relied on this testimony when denying Harcz's motion to quash. (ECF No. 34-5, PageID.336.)  Viewing this disputed evidence in Harcz's favor, Defendants' misrepresentations cannot be chalked up to an "innocent mistake."  Thus, a reasonable jury could find that the Sergeant Henriquez, Trooper Davis, and Officer George's "deliberate or reckless falsehoods result[ed] in arrest and prosecution [of Harcz] without probable cause." *Newman v. Twp. of Hamburg*, 773 F.3d 769, 772 (6th Cir. 2014).

As to the state law malicious prosecution claim, Defendants argue that "the prosecutor's exercise of his independent discretion in initiating and maintaining a prosecution is a complete defense to an action for malicious prosecution." *Matthews v. Blue Cross & Blue Shield of Michigan*, 456 Mich. 365, 384, 572 N.W.2d 603, 613 (1998). But, as Plaintiffs point out, there is

an exception when "the information furnished was known by the giver to be false and was the information on which the prosecutor acted." *Id.* This exception could apply to this case.

Defendants also raise for the first time in their reply that they have absolute immunity for any witness testimony and any testimonial-like statement in police reports. It is generally improper to consider an issue raised for the first time in a reply brief. *Phillips v. City of Cincinnati,* No. 1:18-CV-541, 2020 WL 4698800, at *32 (S.D. Ohio Aug. 13, 2020) (citing *Wright v. Holbrook*, 794 F.2d 1152, 1156 (6th Cir. 1986)). Thus, the Court did not consider Defendants' witness testimony immunity argument in this opinion. *See Taylor v. City of E. Cleveland*, No. 1:20-CV-02507, 2021 WL 229973, at *3 (N.D. Ohio Jan. 22, 2021) (declining to consider issue of qualified immunity raised for first time in reply brief).[8]

## C. Qualified Immunity to Federal Claims

Defendants argue that they are entitled to qualified immunity on Harcz's federal claims. The question, then is whether the law was clearly established. It is clearly established that "a reasonable police officer would know that fabricating probable cause, thereby effectuating a seizure, would violate a suspect's clearly established Fourth Amendment right [to be free from unreasonable seizure]." *Spurlock v. Satterfield*, 167 F.3d 995, 1006 (6th Cir. 1999). "Similarly, a reasonable police officer would be on notice that unlawfully detaining a suspect, despite the fact that the evidence used to detain that individual was fabricated, would also be unlawful." *Id.* Where "the legal question of qualified immunity turns upon which version of the facts one accepts, the

---

[8] Although Defendants do not raise testimonial immunity in their summary judgment motion, Defendants attempt to "incorporate by reference their prior Fourth Amendment arguments. Fed. R. Civ. P. 10(c)." (ECF No. 100 at PageID.1661.) Presumably, Defendants intended to incorporate their arguments in their previous dispositive motion. However, Fed. R. Civ. P. 10(c) applies to pleadings. "Documents that constitute 'pleadings' are specifically enumerated in Fed. R. Civ. P. 7(a), and a motion (or a response to a motion) is not a pleading. *Marco Int'l, LLC v Como-Coffee, LLC*, No. 17-CV-10502, 2018 WL 1790171, at *1 (E.D. Mich. Apr. 16, 2018). Furthermore, Defendants did not adequately address testimonial immunity in its first dispositive motion. They mentioned it only in the middle of a lengthy footnote and stated: "Henriquez has absolute witness immunity for any testimony he gave in court. *See, e.g.*, *Spurlock v. Satterfield*, 167 F.3d 995, 1001 (6th Cir. 1999)."

jury, not the judge, must determine liability." *Sova v. City of Mt. Pleasant*, 142 F.3d 898, 903 (6th Cir. 1998).

### D.  Governmental Immunity to State Law Claims

Defendants argue that they are entitled to governmental immunity on the state law claims. Under Michigan law, lower-level government employees are immune from intentional torts when they 1) act during the course of their employment and act, or reasonably believing they are acting, within the scope of their authority; 2) act in good faith; 3) perform discretionary, rather than ministerial, acts. *Odom v. Wayne Cnty.*, 482 Mich. 459, 473-76 (2008) (citing *Ross v. Consumers Power Co.*, 420 Mich. 567, 633-34 (1984)).  Whether Defendants acted in good faith is the only disputed issue.  The good faith element requires that the officer acts "maliciously, or for an improper purpose." *Id.* at 474 (citing Prosser, Torts (4th ed.), § 132, p. 989). "[W]illful and wanton misconduct is made out only if the conduct alleged shows an intent to harm or, if not that, such indifference to whether harm will result as to be the equivalent of a willingness that it does." *Id.* at 474 (quoting *Burnett v. City of Adrian*, 414 Mich. 448, 455 (1982)).

Defendants argue that the existence of probable cause precludes finding bad faith or otherwise.  "The mere existence of probable cause, however, is not the proper inquiry . . . [it] is relevant to the analysis; a claim of false arrest or false imprisonment cannot be sustained if the arrest was legal." *Id*. at 481.  While the video evidence does not demonstrate any malice or wanton misconduct on the part of the Defendants, the video does not show the entire altercation. Thus, a question of fact exists as to whether Defendants acted in bad faith. In other words, a reasonable jury could find that Defendants acted in bad faith if they accept Harcz's version of events.

**<u>CONCLUSION</u>**

**Accordingly, IT IS HEREBY ORDERED** that Plaintiffs' motion for partial summary judgment (ECF No. 94) is **DENIED** and Defendants' motion for summary judgment (ECF No. 99) is **GRANTED IN PART** and **DENIED IN PART**.

**IT IS FURTHER ORDERED** that Plaintiffs' claims against Defendant Brocklehurst are **DISMISSED WITH PREJUDICE**.

Dated:  September 30, 2021                                    /s/ Gordon J. Quist
                                                          _____
                                                              GORDON J. QUIST
                                                          UNITED STATES DISTRICT JUDGE